ROBERT W. SHIELDS AND GRACE H. SHIELDS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shields v. Commissioner
Docket No. 3962-76.
United States Tax Court
T.C. Memo 1978-120; 1978 Tax Ct. Memo LEXIS 398; 37 T.C.M. (CCH) 537; T.C.M. (RIA) 780120; March 27, 1978, Filed George Constable, for the petitioners. Thomas N. Tomashek, for the respondent. DAWSON
*399 MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Addition to Tax Year
Deficiency
Sec. 6653(b) [1]
1971
$1,598.47
$799.23
1972
1,000.46
500.23
In an amendment to his answer filed at the time of trial the respondent alleged and claimed increased deficiencies for both years resulting from claimed capital loss carryovers on the sale of petitioners' personal residence in 1969. In their opening brief the petitioners have conceded several issues. The concessions are: (1) Petitioners are taxable on the amounts of $7,892.39 and $5,680.93 received in 1971 and 1972, respectively, from literary agencies; (2) they are not entitled to a bad debt deduction of $120 for the year 1972; (3) they are not entitled to a charitable contribution deduction of $250 made to The Church of the Servant, Inc. in 1971; and (4) the assessment of any deficiencies in tax for 1971 and 1972 are not barred by the statute *400 of limitations. The issues remaining for decision are as follows: 1. Whether any part of the underpayment of income tax for each of the years 1971 and 1972 was due to fraud with intent to evade tax. 2. Whether petitioner Robert W. Shields is entitled to deduct various business expenses not claimed on petitioners' joint Federal income tax returns for 1971 and 1972. 3. Whether petitioners are entitled to a deduction for a capital loss carryover for 1971 and 1972 resulting from the sale of their personal residence in 1969. FINDINGS OF FACT Some of the facts are stipulated. The stipulation of facts and supplemental stipulation, together with the attached exhibits, are incorporated herein by this reference. Robert W. Shields and Grace Hotson Shields (petitioners) are husband and wife who resided in Dayton, Washington, when they filed their petition in this case.They filed their joint Federal income tax returns for the years 1971 and 1972 with the Western Service Center, Ogden, Utah. Robert W. Shields (hereinafter called petitioner) was born on May 17, 1918, in Seymour, Indiana. He attended the University of Kentucky during 1935 and 1936. He then attended Franklin *401 College, Franklin Indiana, where he graduated in 1944 magna cum laude with a bachelor's degree in liberal arts. Subsequent to his graduation, he took postgraduate studies at Andover Newton Theological School (1944), Harvard University (1945), Drake University (1950), Garrett Biblical Institute (1950-1951), Montana State College (1959), and the University of Colorado (1960). He was ordained to the ministry by the Baptist Church on October 16, 1940. For 15 years he was a full-time minister and served congregations in Indiana, New Hampshire, Iowa, South Dakota, and West Virginia. He has retained his full professional standing with both the Congregational-Christian Churches, U.S.A., and the United Church of Christ. Beginning in 1960, petitioner was employed as a school teacher in the Kennewick, Washington, area for 5 years. He was later employed for 4 years by R. Wallace Pischel Publishers, Pasco, Washington. In 1969, he moved to Dayton, Washington, and has been employed since then as an English teacher at the Dayton High School. In 1943, the petitioner caused the incorporation of the American Divinity Academy which was devoted to memorization of the Bible. He devoted considerable *402 time and money to the organization and served as its president without salary. In 1953, the petitioner operated, without salary, the National College Student Foundation which was devoted to providing free information on scholarships, grants and loans. He contributed considerable time and money to this organization. He operated it until about 1968 when the Federal government began to enlarge its grants and scholarship activities. The New Church, otherwise known as The Church of The New Jerusalem, consists of members commonly called Swedenborgians. The New Church is a Christian faith with a relatively small, world-wide membership. It is an organized and established church in the United States and throughout the world. It publishes a monthly bulletin for members and others. The New Church theology is based upon the following works of Emmanual Swedenborg: Book
Heaven and Hell Divine Love and Wisdom The Four Doctrines Heavenly Secrets Divine Providence Two books explain Swedenborg's religious teachings. They are entitled "Swedenborg's Religious Thought" and "Swedenborg's Life and Teachings." A book by Helen Keller entitled "My Religion" explains that her *403 religious faith was based upon the teachings of Swedenborg. A book entitled "True Christian Religion" is a digest of Swedenborg's book by that tie of Swedenborg's book by that title. The home church of the New Church in the United States is located in Bryn Athyn, Pennsylvania, where the school and cathedral are integrated into a community. Petitioner's wife, Grace Shields, has a bachelor of science degree in education from The College of the New Church located in Bryn Athyn, Pennsylvania. The petitioner was elected a life member of the Swedenborg Foundation in 1964. On November 18, 1956, petitioner entered into a "unilateral tithing agreement with the Lord" wherein he agreed to pay a portion of his income each year for religious and charitable purposes. He maintained this agreement throughout the years in the combined form of cash payments and the devotion of his time and efforts. Only the cash payments were deducted on his income tax returns. Through the years the petitioners received gross income and made charitable contributions as follows: Gross
Charitable Year
Income
Contributions
1961
$ 7,200
$ 1,295
1962
6,100
1,634
1963
6,700
849
1964
7,300
1,240
1965
9,300
1,207
1966
9,400
1,191
1967
9,800
837
1968
10,500
893
1969
10,000
1,158
1970
9,600
922
1971
9,350
1,207
1972
9,380
810
*404 On February 14, 1964, the petitioners caused Articles of Incorporation of "The Church of the Servant of the Lord Jesus Christ, Inc." to be filed with the State of Washington. The Articles of Incorporation were signed by the petitioners. The Church was organized for nonprofit educational, religious, charitable and benevolent purposes. The Church of the Servant was founded along the general lines of the New Church and adopted the basic teachings of Swedenborg. It also attempted to promote the distribution of his writings. An application for exemption as a section 501(c)(3) organization was never filed by The Church of the Servant with the Internal Revenue Service. Petitioner was the person primarily responsible for the activities of The Church of the Servant. Mrs. Shields and petitioner's children were members. The church conducted its correspondence on printed stationary, and it maintained a post office box in 1964. For about 3 years after the incorporation of The Church of the Servant meetings and services were held weekly in petitioners' home in Kennewick, Washington. Those attending varied from members of petitioners' family to ten or twelve people. When the petitioners *405 moved to Dayton, Washington, in 1969, The Church no longer had regular services. Although Mrs. Shields and the children held family services in their Dayton home, such services were to educate the children in the teachings of the New Church. In Dayton the petitioner and his family regularly attended services at the Congregational Church. Petitioners maintained a worship area in their Dayton home which was used at times for religious services involving Swedenborg's teachings. Petitioners arranged for visits for for visits from ministers from Dawson Creek, British Columbia, to conduct religious services in their home and in their community relating to Swedenborg's teachings.
Petitioner received, on behalf of The Church of the Servant, free literature and financial assistance from the Swedenborg Foundation in his efforts to promote the teachings of Swedenborg. A religious publication entitled "Joseph and His Brethren" was published and distributed by The Church of the Servant. It also acquired hymnals that were embossed in the name of The Church of the Servant. Petitioner sometimes prepared and printed bulletins to be used for services he conducted as a visiting or interim minister *406 at the First Christian Church of Dayton. He also prepared booklets containing sermons he preached at the First Christian Church. These were distributed to friends and members of the church. During the years 1964 through 1969 the income of The Church of the Servant was approximately offset by its expenses with a substantial portion of the income coming from donations by the petitioners. During the years 1967, 1968 and 1969, all income was from petitioner's donations. For the years 1964 through 1972 the cash received and expended by The Church of the Servant was as follows: Cash
Cash Year
Received
Expended
1964
$1,162
$ 924
1965
718
983
1966
590
604
1967
539
536
1968
315
310
1969
558
551
1970
3,228
3,129
1971
8,382
8,451
1972
9,763
9,773
In addition to substituting for other ministers, the petitioner was a full-time interim minister on three occasions: once for three months, once for four months and a third time for a year. Petitioner also filled in for other ministers and performed church services, weddings, funerals and baptisms. In 1971 and 1972 the petitioner supplemented his income from his high school teaching by performing *407 work for literary agents and doing religious work as a minister in the Dayton community. Beginning in 1969 or 1970, the petitioner performed literary work and mailed it to literary agencies. During 1971 he performed literary work and mailed it to Broome Literary Agency, Columbus, Montana. He used the pseudonym "Vincent Inhis." The last work for Broome in 1971 was completed and returned on January 1, 1972. During 1971 and 1972 the petitioner received the sums of $256.73 and $358.33, respectively, from Broome as payment for the work. At petitioner's request the checks from Broome for these amounts were made payable to The Church of the Servant, Inc., and were deposited by petitioner in the bank account of The Church of the Servant. During 1971 and 1972 the petitioner performed literary work and mailed it to Scott Michel, Atlantic Beach, New York. He received the sums of $7,635 and $2,935, respectively, from Michel in payment for the work. At petitioner's direction, 48 of the 49 checks he received from Michel in payment for the work during 1971 and 1972 were made payable to The Church of the Servant, Inc., and 47 of the checks were deposited by petitioner in the bank account *408 of The Church of the Servant. During 1972, the petitioner performed literary work and mailed it to R. C. Research.He received a total of 14 checks from R. C. Research during 1972 in payment for the work. The first check was made payable to Vincent Inhis and the 13 subsequent checks were made payable to The Church of the Servant, Inc., at petitioner's request, and were deposited by him in the bank account of The Church of the Servant, Inc. The 14 checks received by petitioner from R. C. Research during 1972 totaled $3,072.60, but $685 was refunded to R. C. Research, so that the net amount received by him from R. C. Research during 1972 was $2,387.60. The payments received by petitioner during 1971 and 1972 from Broome Literary Agency, Scott Michel, and R. C. Research were not included on his Federal income tax returns for those years. Petitioner filed a Schedule C each year claiming expenses connected with his writing activities, but on the line for gross receipts he put "None." Petitioner maintained a segregated area (study) in his home in 1971 and 1972 which was used exclusively as an office for his literary writing and religious work. Various office equipment was used *409 in the office area. This equipment was purchased and used in the name of The Church of the Servant. Petitioner had an extensive library (2,642 volumes) which he used in his literary writing. He later donated the books to the Penrose Memorial Library of Whitman College. Petitioner incurred office-in-home expenses of $456.86 for 1971 and $543 for 1972. During the years in issue the petitioner used four checking accounts, namely, The Church of the Servant, Inc. account at the National Bank of Commerce, Kennewick, Washington; Robert W. or Grace H. Shields account at Citizens Bank and Trust Company, Chicago, Illinois; Mr. or Mrs. Robert W. Shields account at First Western Bank, New Underwood, South Dakota; and Robert W. Shields or Grace H. Shields account at Seattle-First National Bank, Dayton, Washington. All four of the checking accounts that petitioner had during such years, including The Church account, were used for the payment of the personal living expenses of petitioner and his family. Petitioner was contacted by a special agent of the Internal Revenue Service for the first time on November 15, 1973, and he furnished the special agent with the check register for The Church *410 of the Servant account. On November 27, 1973, the special agent contacted petitioner to make an appointment for a second interview which was held on November 29, 1973.Petitioner furnished a written explanation concerning the personal expenditures paid from The Church account. A final interview of petitioner by the special agent occurred on January 11, 1974. In the statement presented to the special agent on November 29, 1973, petitioner stated that the personal expenditures from The Church of the Servant account constituted refunds for books, a stereo set, and other items needed to maintain his writing activities. In addition, petitioner stated that he had anticipated problems caused by his increased writing activity and had opened a separate account in the name of "Manuscripts" to avoid future problems. The stereo set was used by petitioner for personal purposes having no connection with any church. On August 31, 1973, petitioner opened a bank account in the name of Manuscripts at the Seattle-First National Bank, Dayton, Washington, with a deposit of $20. No other deposits were made to this account until November 26, 1973, when $406.23 was deposited. On September 17, 1973, petitioner *411 wrote to Broome Agency, Inc. concerning payment for literary services he had performed. He requested that "All checks should be made out to The Church of the Servant, Inc., and so reportedc" Between August 31, 1973, and November 15, 1973, petitioner deposited seven checks from Broome in The Church of the Servant account. On November 15, 1973, petitioner wrote to Broome to notify Broome of the special agent's visit on that date. On November 17, 1973, petitioner wrote to Broome to request that future payments for writing services be made to Manuscripts. Between August 31, 1973, and November 15, 1973, petitioner deposited three checks from Scott Michel in The Church account. Prior to November 20, 1973, petitioner contacted Scott Michel concerning his income tax investigation and told Scott Michel what to say if he were contacted by the Internal Revenue Service. Between August 31, 1973, and November 15, 1973, petitioner deposited a check for $300 from R. C. Research (Borgmann) in The Church account. In his correspondence with Broome, Michel, and R. C. Research (Borgmann) during 1971 and 1972, petitioner continually referred to the payments received for his writing services *412 as his own income. The only mention of The Church was in connection with the instructing of Broome, Michel, and Borgmann of how to prepare the checks. On September 3, 1973, petitioner filed a loan application with the Washington School Employees Credit Union, together with an attached letter. He referred to his work for the literary agents and stated that it was not a speculative venture. His reference to his writing income was for the purpose of obtaining a loan to purchase a Selectric typewriter.
During 1971 and 1972, the petitioner presented two financial statements to Seattle-First National Bank, Dayton, Washington, for the purpose of obtaining credit. He listed writing as a source of income, i.e., $4,000 in 1971 and $5,000 in 1972. During 1970 the petitioner received some relatively small payments for preaching at the Christian Church, but did not report the payments on his income tax return. During 1971 and 1972 the petitioner had sole control of The Church of the Servant account, signed all the checks, and made all the entries. Besides writing checks on The Church of the Servant account for personal living expenses of himself and his family, petitioner transferred *413 various amounts of money from The Church account to his other three checking accounts during 1971 and 1972. The other three checking accounts were used to pay personal expenses of petitioner and his family. In 1971, petitioner made a political contribution from one of his personal checking accounts and covered it with a transfer of funds from The Church account. He was aware that legitimate charitable organizations could not make political contributions and maintain their status as organizations contributions to which were deductible. The literary work that petitioner performed during 1971 and 1972 included ghost-writing masters theses and doctoral dissertations for students. He counseled Scott Michel on methods to circumvent the New York law that made it illegal to sell academic papers to students. Petitioner maintained personal control of his tax affairs. He did not employ an attorney or accountant. Petitioner and his family moved from Kennewick to Dayton, Washington, on July 4, 1969. The petitioner conveyed their Kennewick residence to Ralph Conner and his wife by a waranty deed dated September 15, 1969. During 1969 the Kennewick residence was not used for any business *414 purpose. It was the personal residence of the petitioners. Petitioners' Federal income tax returns for 1971 and 1972 were filed on or before April 15, 1972, and April 15, 1973, respectively. The amounts of gross income stated on the returns were $9,400.97 for 1971 and $9,521.02 for 1972. In addition thereto, petitioners received the amounts of $7,892.39 and $5,680.93, respectively, during 1971 and 1972, which amounts were not included in their gross income for those years. Petitioner incurred additional business expenses from his literary writing and religious work, which were not claimed on his Federal income tax returns, of $500 for 1971 and $500 for 1972. ULTIMATE FINDINGS OF FACT 1. A part of the underpayment of income tax for each of the years 1971 and 1972 was due to fraud on the part of petitioner. 2. Petitioner is entitled to deduct office-in-home expenses for his literary and religious work in the amounts of $456.86 for 1971 and $543 for 1972. He is also entitled to deduct additional business expenses for such activities in the amounts of $500 for 1971 and $500 for 1972. 3. Petitioners are not entitled to deduct a capital loss incurred on the sale of *415 their personal residence in Kennewick in 1969 and carried over to 1971 and 1972 in the amount of $1,000 for each year. OPINION Issue 1--Additions to Tax under Section 6653(b)
Respondent must prove fraud by clear and convincing evidence. Section 7454(a) of the Code; Rule 142(b), Tax Court Rules of Practice and Procedure; Arlette Coat Co. v. Commissioner,14 T.C. 751 (1950); Green v. Commissioner,66 T.C. 538, 549 (1976). The existence of fraud is a question of fact to be resolved upon consideration of the entire record before us. Gajewski v. Commissioner,67 T.C. 181, 199 (1976). To establish fraud the Commissioner must show that the taxpayer deliberately intended to evade the payment of taxes by conduct intended to conceal, mislead or otherwise prevent the collection of such taxes. Spies v. United States,317 U.S. 492, 499 (1943); Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968); Grudin v. Commissioner,536 F. 2d 295 (9th Cir. 1976). In our opinion the respondent has carried his burden of proof on the fraud issue. Petitioner requested that the literary *416 agencies make the checks for his writing services payable to The Church of the Servant, and, having received the payments and used them to pay his personal living expenses, he failed to include them on his 1971 and 1972 Federal income tax returns. On the Schedules C attached to the returns the petitioner showed his business as being a writer, and he deducted the expenses attributable to his writing activity, but he reported none of the income generated by his writing. The record establishes that his failure to report the writing income was not due to mere inadvertence or negligence, but was done with the intent to evade the payment of his income taxes. By the time the petitioner began earning a substantial amount of income from his writing activities in 1971 and 1972, The Church of the Servant was an organization in name only. Its attendance at the peak of its activity in 1964 and 1965 never had exceeded 12 or 15 persons, and by 1969 its active membership was confined to petitioner's wife and children. It is incredible, we think, that the petitioner believed that he legally could avoid paying taxes on his income by having the checks made payable to an organization that, for all *417 practical purposes, had ceased to exist. The conclusion we draw from this record is that petitioner was aware of the taxability of his writing income and intended to use the artifice of The Church of the Servant to conceal the income for as long as he could. Several factors are indicative of petitioner's fraudulent intent. They are: 1. The income omitted from the Federal income tax returns for 1971 and 1972 was nearly half of the income received by petitioners during those years. Thus the percentage of omitted income was substantial. 2. The library donation of petitioner was a transparent attempt to justify his failure to report his writing income. With The Church of the Servant consisting of his wife and children (and even their participation was sporadic), it is difficult to perceive a reason for The Church to be purchasing a library of 2,642 volumes. The only persons with access to the library were petitioner and his family, and there was no change in access to the library merely because it was allegedly being purchased by The Church. In fact, if respondent's special agent had not asked petitioner how The Church was going to use a 2,642 volume library, we think petitioner *418 still would be using that excuse to justify his failure to report his writing income. Despite the fact that he had accumulated the books over a 40-year period and had an emotional attachment to them, he arranged to donate them to Whitman College after the special agent contacted him. The reason for the donation was clear, as spelled out by petitioner in his diary on December 19, 1973, "My idea is to give it to Whitman as evidence that no tax avoidance was intended (I will scarcely even breathe, much less mention, the word evasion)." The library donation was simply an attempt by petitioner to conceal his fraudulent intent in assigning his income to The Church, using the funds for his personal expenses, and failing to report the income on his returns. 3. In September 1973, the relationship between Dmitri Borgmann of R.C. Research and petitioner worsened to the point that Borgmann threatened to report petitioner to the Internal Revenue Service because petitioner was not reporting his writing income. Petitioner wrote Borgmann a letter accusing him of having reported him (petitioner) to the Internal Revenue Service. In his diary for September 17, 1973, petitioner wrote "Of course, *419 I know this is not true but by making the accusation, I hope to divert him from any inclination to report me so I will be audited." It is not difficult to see the reason for petitioner's concern over an audit and his attempt to prevent an audit of his returns. 4. Petitioner attempted to justify his failure to report his writing income on the ground that it was somehow part of a tithing program that he had followed for a number of years. However, he was unable to explain how the payment of his personal expenses from The Church account qualified as a tithe. The thrust of his explanation was that he used all four of his checking accounts, including The Church account, to pay his expenses, depending upon which account had funds in it. He also claimed that he had made a loan to The Church in 1972 for some unspecified future projects that did not materialize, and that The Church was repaying the loan when petitioner's personal expenses were paid from The Church account. However, he was unable to explain the circumstances of the loan. It is clear from looking at the check register for The Church account that petitioner merely obtained a loan at Washington Teachers' Credit Union and *420 deposited the $1,500 in The Church account on June 2, 1972. This does not establish that petitioner made a loan to The Church, and it does not justify petitioner's payment of personal expenses in excess of $1,500 from The Church account following June 2, 1972. It certainly does not explain petitioner's payment of his personal expenses from The Church account prior to June 2, 1972. We view the tithing and loan stories as additional examples of the lengths to which petitioner went to attempt to justify his conduct. 5. Other minor factors tend to support the conclusion that petitioner omitted his writing income with intent to evade tax on it. Among these are his frequent references to the writing income as his own (rather than that of The Church) in his correspondence with the literary agents and in his loan applications; his counseling of Scott Michel on methods to circumvent a New York law prohibiting ghost-writing of adademic papers; and his payment of typists in cash and telling them the payments were nontaxable gifts. After examining and evaluating the facts of record, we conclude that the respondent has carried his burden of proving fraud by clear and convincing evidence.
*421 Issue 2--Office-in-Home and Business Expenses
We hold that the petitioner is entitled to deduct home office expenses in the amounts specified in our ultimate findings of fact. It is true that in Sharon v. Commissioner,66 T.C. 515 (1976), this Court narrowed the scope of the home office expense deduction to exclude "incidental" use of a portion of a residence for business. It was stated in Sharon that "the use of a portion of an apartment for business purposes for reasons of personal convenience, comfort, or economy will not support a deduction under section 162 (a)." Sharon v. Commissioner,supra at 524 and 525. However, petitioner's situation is factually distinguishable from Sharon.Petitioner did not set up his home office because it was more convenient to work at home. It was the only place he could do his literary writing. The facts plainly show that his business use of the study in his home was "substantial," if not exclusive, rather than "incidental." Applying the balancing test as set out in Sharon, we think the petitioner's substantiated expenses were not merely "appropriate and helpful" but were "necessary" for *422 his literary writing. The record contains very little credible evidence that supports the additional business expenses claimed by the petitioner in the amounts of $3,385.99 for 1971 and $3,699.34 for 1972. The schedules and testimony of petitioner are largely self-serving. However, we believe an approximation under the rule of Cohan v. Commissioner,39 F. 2d 540, 544 (2d Cir. 1930), is justified. Therefore, we have made an approximation, "bearing heavily" upon the petitioner "whose inexactitude is of his own making." Cohan v. Commissioner, supra at 544. The business expenses allowed are set forth in our ultimate findings of fact and can be given effect in the Rule 155 computations. Issue 3--Loss on Sale of Residence
On July 4, 1969, petitioners moved from their residence in Kennewick to Dayton, Washington. By deed dated September 15, 1969, they conveyed the residence to Ralph Conner and his wife. No business was conducted at the residence by petitioners during 1969. It was their personal residence. A loss incurred on the sale of a personal residence is not deductible. Section 1.165-9(a), Income Tax Regs.; Elliott v. Commissioner,T.C. Memo. 1971-239 (1971), *423 and the cases cited therein. Petitioner testified that the residence was not used for any business purpose in 1969. Accordingly, we hold that the loss is not deductible. To reflect the concessions previously made and our conclusions on the disputed issues, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise indicated.↩