GENE P. GREEN AND LOUISE GREEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1785-73.     Filed June 22, 1976.

*Larry L. Lenoir,* for the petitioners.
*Frank Simmons,* for the respondent.

BRUCE, *Judge:* Respondent determined the following deficiencies in Federal income taxes and additions to tax against the petitioners:

| Year | Deficiency | Addition to tax sec. 6653(b)[1] |
|------|-----------|----------------------------------|
| 1964 | $2,078.35 | $1,039.18 |
| 1965 | 9,997.54 | 4,998.77 |
| 1966 | 3,738.38 | 1,869.19 |

Two issues are presented for determination: (1) Whether petitioners had unreported income from a partnership engaged in gambling operations, and, if the first question is answered in the affirmative, (2) whether petitioners' failure to report such income was due to fraud.

### FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners are husband and wife. During the relevant portion of taxable year 1964 petitioners were residents of Long Beach, Miss. During the taxable years 1965 and 1966 petitioners resided in Mississippi City, Miss. At the time of the filing of their petition herein, petitioners were residents of Gulfport, Miss. Petitioners filed their Federal income tax returns for the years 1964 and 1965 with the District Director of Internal Revenue, Jackson, Miss., and their 1966 return was filed with the Internal Revenue Service Center, Chamblee, Ga. The amounts here in dispute relate to the activities of Gene P. Green, and his wife, Louise, is a party to this litigation only because she filed joint returns with her husband. When used hereafter, "petitioner" will refer to Gene P. Green.

Prior to moving to Mississippi in May or June of 1964, petitioner and his family resided in Hot Springs, Ark. Petitioner was there employed in a gambling casino where he served as a

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

dealer and "boxman" at dice tables. Petitioner's duties did not include any record or bookkeeping functions.

During late May or June of 1964, petitioner and his family moved to Long Beach, Miss., where petitioner and four other individuals—Richard K. Head, Jack N. S. Denis, Sam F. Uchello, and Herschal D. Dyer (hereafter Head, Denis, Uchello, and Dyer) formed a partnership for the purpose of operating the Raven Club (hereafter the Raven Club or club). Petitioner, Denis, Uchello, and Dyer each contributed $2,000 to the partnership, and each one also contributed an additional $500 for Head, who furnished the lease and paid renovation costs on the building in Biloxi which housed the Raven Club. The partners agreed to share profits equally and the three active partners, petitioner, Denis, and Uchello were to be paid salaries of $100 a week. The partnership, and successor partnerships which operated the Raven Club, employed the cash receipts and disbursements method of accounting. The partnerships did not maintain a bank account.

The Raven Club began operation on July 18, 1964, and continued in existence until June 30, 1966. The club provided free food and beverages to customers and offered a variety of gaming activities including two dice tables, one roulette wheel, three blackjack tables, and slot machines.

On January 22, 1965, Dyer withdrew from the partnership and the four original partners formed a new partnership which was similar in all respects to the former partnership. During the period from May 1965 through October 1965, the partnership conducted similar gambling operations at another Biloxi establishment, the Sa When Club. The Raven Club and the Sa When operations were treated as one combined partnership business. On March 5, 1966, Head withdrew from the partnership, and petitioner, Uchello, and Denis formed a new partnership to conduct the Raven Club business.

Customers were required to use chips in making wagers. No cash was allowed on the gambling tables. Patrons could purchase chips from a "boxman" stationed at each table. When a customer concluded his play for the evening, a "boxman" would exchange any remaining chips for cash. There was no central cashier's cage and the "boxmen" did not record the amounts received for chips nor the amount paid to redeem chips.

The cash in the several boxes constituted the gambling bankroll or "kitty." All gambling payouts, amounts paid to redeem chips, as well as all business expenses, e.g., rent, utilities, and food, were paid in cash from the "kitty." Petitioner normally carried the "kitty" on his person. However, if the "kitty" became extremely large, other partners would share the responsibility of carrying the currency.

Petitioner was primarily responsible for maintaining partnership records although he had no previous experience or training as a bookkeeper. At the end of each gambling day petitioner and at least one other partner would count the money in the boxes. If, after taking into account all expense disbursements, the amount exceeded the count on the preceding day, the partners would record a "win" and the amount thereof. Conversely, if the amount in the "kitty" was less than the amount present on the preceding day, the difference was recorded as a "lose." The difference represented the net gain or loss for that day without regard to each separate gain or loss from a particular gaming activity. The partnership maintained a daily record of the beginning bankroll, gain or loss from gambling, and operational expenses incurred. This record was maintained by petitioner in calendar notebooks for each year of operation. An example of entries from the 1964 notebook are set forth herein:

Thursday, Oct. 1

|  |  |  | $25,051 |
| Win | _____ |  | 271 |
|  |  |  | 25,322 |
| Pay out | _____ |  | 153 |
|  |  |  | 25,169 |

Friday, Oct. 2

|  |  |  | 25,169 |
| Lose | _____ |  | 60 |
|  |  |  | 25,109 |
| Pay out | _____ |  | 45 |
|  |  |  | 25,064 |

Saturday, Oct. 3
Closed—Storme [sic]

|  |  |  | 25,064 |
| Net pay roll | _____ | $584 |  |
| Employ tax WH | _____ | 61 | 645 |
|  |  |  | 24,419 |

These entries indicate that prior to beginning play on October 1, 1964, the partnership bankroll was $25,051. The partnership had a net gain of $271 as a result of play that evening, and paid $153 in expenses. Similarly, the partnership lost $60 as a result of operations on Friday, October 2, 1964, and paid $45 in expenses. The club was closed on Saturday, October 3, however the weekly payroll and employee tax withholding are reflected.

The partnership records thus reflected daily net gains and losses from gambling and the total amount of cash paid for necessary expenses and salaries. This record and all cash receipts for expense items were delivered monthly to William G. Murphy, Jr., an experienced public accountant, who maintained a journal and general ledger for the partnership. With the cash receipts for all expense disbursements, Murphy was able to identify and account for all expense payments noted in the daily record. For example, the credit entries to "cash" and debit entries to various expense accounts for October 1 and 2, 1964 (see the daily record illustration above), indicate the following expense disbursements:

| Oct. | Cash | Building Repair | Linen | Liquor | Coke | Food | General |
|---|---|---|---|---|---|---|---|
| 1 Grover Graham Jr. & Co. | $146.26 | - - - | - - - | $146.26 | - - - | - - - | - - - |
| Mobile Linen | 1.66 | - - - | $1.66 | - - - | - - - | - - - | - - - |
| Sandwiches | 4.75 | - - - | - - - | - - - | - - - | $4.75 | - - - |
| | $152.67 | | | | | | |
| 2 Gulf Coast Lumber Co. | 3.15 | $3.15 | - - - | - - - | - - - | - - - | - - - |
| Wilkes Printing Co. | 17.50 | - - - | - - - | - - - | - - - | - - - | $17.50 (office supplies) |
| Coca Cola Bottling | 10.00 | - - - | - - - | - - - | - - - | - - - | 10.00 (coke box) |
| Coca Cola | 9.45 | - - - | - - - | - - - | $9.45 | - - - | - - - |
| Sandwiches | 5.00 | - - - | - - - | - - - | - - - | $5.00 | - - - |
| | 45.10 | | | | | | |

The partnership daily records, supplemented by cash receipts evidencing payouts, were the sources from which Murphy compiled formal partnership books. Additionally, Murphy prepared Federal employment tax and partnership information returns.

Petitioner also kept a personal record of all partnership gains and losses in a separate notebook. This personal record was maintained in the event the partnership records, which were kept in a desk at the club, were destroyed or stolen. The figures in both notebooks correspond except that the partnership records were generally more detailed.

Petitioner was a partner in each of the three partnerships which operated the Raven Club. A total of five partnership

information returns, Forms 1065, were filed during the 24 months the Raven Club was in operation. Partnership gross income was computed by netting all daily win and loss figures during the taxable period. The net result was reported on line 1 of the partnership returns as "Gross receipts" and also on line 12 as "Total income." Deductible business expenses were subtracted from this figure to arrive at distributable income.

The records of the Raven Club indicate the following wins and losses during the 3 calendar years of operation:

### Calendar year 1964

| | |
|---|---|
| Number of days on which wins are reported | 104 |
| Number of days on which losses are reported | 58 |
| Total days of operation | 162 |
| Total amount of wins | $97,926.00 |
| Total amount of losses | 44,506.00 |
| Net income from gambling | 53,420.00 |

### Calendar year 1965

| | |
|---|---|
| Number of days on which wins are reported | 216 |
| Number of days on which losses are reported | 127 |
| Total days of operation | 343 |
| Total amount of wins | 260,993.00 |
| Total amount of losses | 121,233.00 |
| Net income from gambling | 139,760.00 |

### Calendar year 1966

| | |
|---|---|
| Number of days on which wins are reported | 90 |
| Number of days on which losses are reported | 61 |
| Total days of operation | 151 |
| Total net wins | 90,687.10 |
| Total net losses | 62,691.00 |
| Net income from gambling | 27,996.10 |

Respondent disallowed all daily loss figures and correspondingly increased partnership income by the same amount.

The parties have stipulated that no method, other than disallowance of the net daily gambling losses, was used in determining petitioners' gross income.

## ULTIMATE FINDINGS OF FACT

The Raven Club incurred deductible gambling losses during the taxable years in the following amounts:

| | |
|---|---|
| 1964 _____ | $40,055.40 |
| 1965 _____ | 109,109.70 |
| 1966 _____ | 56,421.90 |

## OPINION

Respondent contends that the records maintained by the Raven Club partnerships do not satisfy the requirements of section 6001, and the regulations thereunder, since they do not contain information as to gross receipts and total gambling disbursements. Respondent also contends that the records are inadequate to determine the character of income and deductions under section 702(b). Further, respondent claims that the records fail to prove the total amount of gambling losses and, therefore, a deduction under section 165(d) is not allowable. Finally, the Government contends that since the records fail to "clearly reflect income," it has authority by virtue of section 446(b) to disallow all daily net losses and accordingly to increase petitioner's distributive share of partnership income.

The deficiency determination by respondent is presumptively correct, *Welch v. Helvering,* 290 U.S. 111, 115 (1933); *Wickwire v. Reinecke,* 275 U.S. 101, 105 (1927), and petitioner bears the burden of proving otherwise. Rule 142, Tax Court Rules of Practice and Procedure. The disallowance of daily net gambling losses is not an arbitrary, erroneous, or unreasonable method of reconstructing income under certain circumstances. *Stein v. Commissioner,* 322 F.2d 78 (5th Cir. 1963), affg. a Memorandum Opinion of this Court; *Plisco v. United States,* 306 F.2d 784 (D.C. Cir. 1962). Disallowance of such losses is based on the theory that the total amount of wins can be accepted as an admission against interest while the amount of total losses is merely a self-serving declaration which must be proven by verifiable data. Respondent did not consider using another method of reconstructing income but, according to the testimony of the revenue agent, relied on "case law" in disallowing all losses.

Respondent urges that *Stein v. Commissioner, supra,* is controlling since this Court is obligated to follow decisional law "squarely in point" by the Court of Appeals to which an appeal in

the instant case would lie. *Jack E. Golsen,* 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1972). Such reliance is misplaced since we find little similarity between *Stein* and the case at bar.

The taxpayer in *Stein* was a professional gambler most of whose gambling activities included poker, dice, gin rummy, and betting on sports events. He did not engage in bookmaking or operate a gambling establishment. He purportedly counted his bankroll prior to engaging in a gambling activity, but made no record of this amount. At the conclusion of his play he recounted his bankroll to determine whether he had a gain or loss. The difference between what he remembered his beginning bankroll to have been and his ending balance was noted on a scrap of paper, such as a cocktail napkin, match cover, soap wrapper, etc., with the date and a "W" or "L" indicating a win or loss. These scraps of paper were allegedly retained in a drawer at the taxpayer's home and the daily win and loss figures were transcribed in a notebook at the end of each year. The taxpayer computed his income for the taxable year by netting all wins and losses recorded in the notebook. At trial the taxpayer relied on the *summarized records* contained in his notebook to prove gambling gains and losses. These records were found on the whole to be unreliable and the truthfulness of taxpayer's testimony was questionable. Under these circumstances, where there was no corroborating evidence, the disallowance of daily net loss amounts was upheld. Further, the *Cohan* rule, *Cohan v. Commissioner* 39 F.2d 540 (2d Cir. 1930), was held inapplicable since there was insufficient evidence upon which a valid approximation of deductible losses could be determined.

Similarly, in *Plisco v. United States, supra,* daily net losses were disallowed a bookmaking partnership. The partners destroyed all verifying records, particularly the betting slips and "20-line sheets," and relied only on books summarizing their daily gambling profits and losses.

While we agree generally with the decisions in *Stein* and *Plisco,* we do not regard those cases as authority for respondent to summarily disallow all losses simply because the taxpayer is a gambler who has netted his wins and losses. The question of the amount of losses sustained by a gambling partnership is essentially one of fact to be determined from the entire record, *H. T. Rainwater,* 23 T.C. 450 (1954), and, obviously, the facts in

each case differ. In our opinion petitioner has met his burden of proving that substantial losses did occur and we are convinced that his records essentially reflect the amount of losses sustained. The present case involves different types of gambling activities and is clearly distinguishable from *Stein* and *Plisco.*[2] We hold that petitioner is entitled to his share of partnership losses as set forth in our ultimate findings of fact. We base our determination on the following considerations.

First, petitioner produced original records of the partnership which reported wins, losses, expenses, payroll disbursements, distributions to partners, and a running balance of the partnership bankroll. These records were made at the end of each day's activities and constitute a clear, systematic, and consistent record of the partnership activities throughout the period in which the Raven Club was open. These records were also consistent with the personal records kept by petitioner. The daily computations of "win" or "lose" were made with at least two partners present and apparently were relied on by the absentee partners in determining their division of the profits.

The present case differs from those cases where original records were not submitted in evidence usually because they had been deliberately destroyed. E.g., *Plisco v. United States, supra; Anthony Delsanter,* 28 T.C. 845 (1957); *Jack Showell,* 23 T.C. 495 (1954), revd. 238 F.2d 149 (9th Cir. 1956); T.C. Memo. 1957-22, on remand revd. 254 F.2d 461 (9th Cir. 1958); T.C. Memo. 1960-7 on second remand affd. 286 F.2d 245 (9th Cir. 1961); *H. T. Rainwater,* 23 T.C. 450 (1954). We are not faced with the problem of accepting transcriptions from original records to secondary books. It is recognized that original records do not necessarily assure an accurate account of business transactions, since parties sometimes intentionally or negligently fail to keep complete records. However, original entries may merit consideration.

The very nature of a casino operation makes it difficult to maintain extensive verifying records in contrast with bookmaking operations on horseracing or sporting events which require written records of each wager in order for the bookmaker and the bettor to have proof of their wager. Also, wagers are oftentimes placed well in advance of the race or event and the

---

[2] Compare *Golden Nuggett, Inc.,* T.C.Memo. 1969-149; *Aaron Greenfeld,* T.C.Memo. 1966-83.

bettor may not collect his winnings until several days after the event. The instant case does not involve bookmaking but casino style gambling where, from a practical standpoint, it is impossible to record each separate roll of the dice or spin of the wheel. Casino operators are not excused from keeping adequate records and they assume a risk in not maintaining books sufficient to verify figures on a tax return. But what constitutes sufficient records depends, in each case, on the nature and complexity of the business. In the present case, we find the records sufficient to show wins and losses and we believe they are substantially accurate.

A qualified public accountant employed by the partners to maintain formal books and records and to prepare their tax returns testified that, in his opinion, the method of reporting used complied with general accounting principles. The regular disclosure of the daily records to an accountant and the maintenance of a journal and general ledger by the accountant which appear to be unusually complete and accurate for a gambling operation of the kind involved herein have in large measure dispelled any notion of connivance or deceit on the part of the petitioner in reporting his gambling losses. Respondent's agents testified that petitioner had been cooperative and forthright throughout their investigation, and from our observation of the petitioner as he testified at the trial, we are satisfied that his testimony concerning his business affairs was substantially trustworthy and credible.

We think it is an obvious fact that a gambling operation such as that conducted by the Raven Club could not have been carried on without incurring some losses. Respondent, in effect, has recognized that the partnership incurred a certain amount of losses to the extent that for each "win" day an unknown amount of losses was subtracted from an unknown amount of wins. It is unrealistic to assume that the operation did not have some days on which losses in excess of wins were incurred. On the basis of all the facts shown in the present case, we see no reason for not accepting the reliability of the partnership records on the "loss" days as well as the "win" days. Cf. *John Federika,* a Memorandum Opinion of this Court (14 T.C.M. 653, 657-3, P.H. Memo. T.C. par. 55,172 (1955)), affd. per curiam 237 F.2d 916 (6th Cir. 1956), cert. denied 352 U.S. 1025 (1957), rehearing denied 353 U.S. 931 (1957); *Herman Drews,* 25 T.C. 1354

1354 (1956); *Jack Showell, supra.* [3]

One of the troublesome aspects of this and similar cases is that respondent has not seen fit to indicate what records would be deemed sufficient to prove losses under section 165(d). The regulations under section 6001 certainly do not specify an ironclad formula, particularly for professional gamblers. Apparently it is respondent's position that petitioner's fault was in not maintaining a record of gross receipts and gambling payoffs. A tabulation of the amounts paid for chips less the amount paid to redeem chips would have served to verify the net win or loss figures recorded by petitioners since, under either approach, the same mathematical result would obtain. But failure to account for gross receipts and gambling disbursements does not warrant total disregard of the daily net loss figures where, as here, it is shown that those amounts were obtained from orderly records and, when subtracted from the amounts reported as net wins, are sufficient to calculate gross income and net income. We believe these records are substantially accurate and that the difference between wins and losses constitutes gross income. Cf. *James P. McKenna,* 1 B.T.A. 326 (1925); *Winkler v. United States,* 230 F.2d 766 (1st Cir. 1956).

Section 165(d) permits the deduction of gambling losses to the extent of gambling gains. Under the facts of this case, we think the method of reporting employed by petitioner results in an accurate computation under that provision. Since there is no dispute as to the character of income, it is unnecessary to consider respondent's contentions under section 702(b).

Although we believe petitioner's computations are substantially accurate, we deem it appropriate to make a minor adjustment under the *Cohan* rule.[4] This is due to two factors. First, petitioner and his partners could have segregated the slot machine operation from the gaming activities and provided exact data as to winnings from the slot machines. Secondly, although there is no evidence of any irregularities or misappropriations on the part of those handling the "boxes," we think a record of the amount of cash and chips given each boxman at the beginning of play, the amount of cash paid out in redemption of chips, and the

---

[3] Compare *Golden Nugget, Inc.,* T.C. Memo. 1969-149; *Anthony F. Gallagher,* T.C. Memo. 1968-27; *Harry Bennett,* T.C. Memo. 1968-71; *B. H. Bickers,* T.C. Memo. 1960-83; *Clarence E. Baldwin,* T.C. Memo. 1955-200.

[4] *Cohan v. Commissioner,* 39 F.2d 540 (2d Cir. 1930).

amount of cash and chips in possession of each boxman at the end of play would have furnished more control and perhaps a more reliable record of gains and losses. Absent any defalcations, the result should be the same. For these reasons, and using our best judgment, we have found the partnership had deductible gambling losses as reported in our ultimate findings of fact.

We turn now to the second issue on which respondent bears the burden of proving fraud by clear and convincing evidence. *Carter v. Campbell,* 264 F.2d 930, 936 (5th Cir. 1959). "The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Mere negligence does not establish either." *Mitchell v. Commissioner,* 118 F.2d 308, 310 (5th Cir. 1941).

In attempting to meet this burden respondent has sought to link several events which, he claims, prove fraud on the part of petitioner. First, respondent offered testimony of two revenue agents and a special agent which, taken together, indicated that Denis was issued an "inadequate records notice" in 1962 while operating a gambling establishment in Biloxi known as the Key Club. Secondly, the testimony further indicated that Uchello was formerly a partner in a Biloxi gambling establishment known as the Gay Paree. During an audit of the Gay Paree in 1963, a revenue agent testified that he orally advised Uchello that the records were inadequate; however, the agent also testified that Uchello had terminated his interest in the Gay Paree partnership prior to the audit. Both clubs employed a netting system like, or similar to, the one used by petitioner in determining gaming profts. Since petitioner's partners, Uchello and Denis, had knowledge that more detailed records were required, and since the reporting system used by petitioner was discussed with and approved by all partners, respondent contends that these and surrounding facts create a strong inference that the three active partners willfully and knowingly maintained books and records designed to conceal essential information as to receipts, disbursements, and actual income.

While "direct proof of fraud is seldom possible," *Leon Papineau,* 28 T.C. 54, 57-58 (1957), we believe the link which respondent has attempted to establish is far too weak and tenuous to constitute clear and convincing evidence for three reasons. First, petitioner denied having knowledge of the notices issued to Denis and Uchello, and we believe his testimony. Secondly, the

notice issued to Denis is itself inadequate for us to conclude that he was informed that a netting of wins and losses was improper. The notice states:

Taxpayer failed to keep records of names and addresses of individuals from whom he accepted wagers and to whom he made payments.

Although the taxpayer is apparently not operating at all at the present time, the possibility exists that he may be able to go back into business at some future date.

Read literally, the notice says nothing about netting income and losses nor does it require the reporting of gross receipts and gambling disbursements. Thirdly, in view of these circumstances, we refuse to impute knowledge from Denis and Uchello to petitioner where we are unconvinced that Denis and Uchello had knowledge of what system respondent considered adequate, or inadequate, in reporting gains and losses from gambling. "It [fraud] is never imputed or presumed and the courts should not sustain findings of fraud upon circumstances which at the most create only suspicion." *Davis v. Commissioner,* 184 F.2d 86, 87 (10th Cir. 1950); *Olinger v. Commissioner,* 234 F.2d 823 (5th Cir. 1956).

Finally, respondent is left with one argument on the issue of fraud. Even assuming the Raven Club operation violated Mississippi and Federal law, we think that fact standing alone is insufficient to prove fraud in the filing of tax returns. We therefore hold petitioner not liable for the civil fraud penalty under section 6653(b).

In order to give effect to our determination,

*Decision will be entered under Rule 155.*