ODYSSEUS METAS AND ANTOINETTE METAS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Metas v. Commissioner
Docket Nos. 10094-79, 10096-79, 16834-79.
United States Tax Court
T.C. Memo 1982-36; 1982 Tax Ct. Memo LEXIS 703; 43 T.C.M. (CCH) 376; T.C.M. (RIA) 82036; January 29, 1982. Odysseus Metas, pro se. Louis T. Conti, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in and additions to the petitioners' Federal income tax: Taxable
Date Statutory
Addition to Tax
Year
Notice Mailed
Deficiency
Sec. 6653(b) [1]
1972
4/13/79
$ 82,015
$ 41,007.50
1974
9/14/79
72,769
36,384.50
1975
4/13/79
6,813
3,407.00
In his Answers filed in docket Nos. 10094-79 and 10096-79, which relate to the 1972 and 1975 taxable years, respondent affirmatively alleges that the amount of the deficiency for 1972 is $ 116,841 rather than the $ 82,015 determined in the statutory notice. Respondent has also filed an amendment to his Answer in docket No. 10094-79, alleging that in the alternative to the $ 3,407 section 6653(b) fraud addition to tax determined by the Commissioner against petitioners for 1975, petitioners are liable for a section 6653(a) negligence addition to tax for such taxable year. In his *705 Brief, respondent does not contend for or even address any fraud addition for 1975. He argues only for the imposition of a negligence addition. As respondent has abandoned the issue of fraud for 1975, we will consider him to have conceded such issue. Accordingly, the issues before us are: (1) whether certain evidence is admissible; (2) whether the period of limitations has run with respect to the taxable years 1972 and 1974; (3) whether petitioners have proven by a preponderance of the evidence that the Commissioner's determination of their 1975 gambling income was erroneous; (4) whether we may apply the rule in Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), and estimate petitioners' gambling losses for the taxable year 1975; (5) whether respondent has shown by clear and convincing evidence that petitioners made an underpayment of their Federal income tax for their taxable years 1972 or 1974 and that some part of such underpayment is due to fraud on the part of petitioner Odysseus Metas; and (6) whether respondent has shown by a preponderance of the evidence that petitioners made an underpayment of their 1975 Federal income tax and that some part *706 of such underpayment is due to negligence. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners timely filed their joint Federal income tax returns for their taxable years 1972, 1974 and 1975 with the Internal Revenue Service. At the time that they filed their petitions herein, petitioners resided at Philadelphia, Pennsylvania. During the years 1972, 1974 and 1975, petitioner Odysseus Metas (Mr. Metas) was engaged in wagering on horse races. During these years, he also made frequent trips to Las Vegas, Nevada, where he would gamble practically "round-the-clock" in casinos, playing blackjack, craps, and other games of chance. Mr. Metas had no specific style or habit of betting at the horse races. He would bet on exactas, big E's, and trifectas by purchasing appropriate racetrack tickets. Many times he "hit," i.e., purchased a ticket from which he won more than it cost him to acquire, and many times he received less than he had paid for the ticket or nothing. Mr. Metas maintained inaccurate records of his racetrack gambling; he maintained no records *707 at all of his Las Vegas gambling. During the years in issue, Mr. Metas would receive Forms 1099 (U.S. Information Returns) from the various racetracks which recorded a portion of his winnings. He was very careless in his handling of these documents and took no especial pains to retain them. He would put them under his car seat, in his car trunk, in a shoebox, in his basement, kitchen or bedroom. He had no regular procedure for storing them and was not terribly interested in where he kept them. When it came time to prepare and file petitioners' tax returns for the years in issue, Mr. Metas would gather up all of the Forms 1099 he could find and enter the winnings which they reflected chronologically in a notebook. He also entered in the notebook figures purporting to be amounts paid for racetrack tickets. The amount of winnings reflected on a Form 1099 for a given date would be entered across from the amount allegedly paid for tickets on that date. Mr. Metas would subtract the sum of the listed ticket prices from the sum of the listed winnings and arrive at a net profit figure. He would provide this figure, along with the Forms 1099, to Irving Eichenbaum, the accountant who prepared *708 petitioners' Federal income tax returns for the years in issue. Mr. Metas did not submit the notebooks to Mr. Eichenbaum. Mr. Eichenbaum added the winnings recorded on the Forms 1099 and entered this sum on Form 1040, Schedule E, Part III, as "Income from Partnerships, Estates or Trusts, Small Business Corporations." He subtracted the profit figure provided him by Mr. Metas from this sum and entered the resulting amount immediately below the income figures as "losses." He then entered the profit figure below the other two amounts and included the profit figure in the petitioners' adjusted gross income. The figures in the notebooks and the amounts reported on petitioners' returns in Schedule E, Part III, do not accurately summarize the gross income and losses from Mr. Metas' gambling activities. The notebooks are incomplete in that they do not record all of Mr. Metas' winnings and losses from racetrack gambling. Mr. Metas had racetrack winnings which were not reflected on any forms 1099. He also had winnings and losses from his Las Vegas gambling excursions, none of which are reflected in the gambling winnings and loss figures in the notebooks or reported on the tax returns. *709 The following chart shows, for the years 1972 and 1974, (1) Mr. Metas' income from racetrack gambling which was reported to the Internal Revenue Service by the racetracks on Forms 1099 ("1099 income") and which Mr. Metas entered in his notebooks and included in his returns; (2) Mr. Metas' 1099 income which was not entered in his notebooks and was not included in his returns, and (3) Mr. Metas' income from racetrack gambling which was not reported on Forms 1099 but which Mr. Metas nevertheless entered on his notebooks and included in his tax returns: 1972
1974
No. of
No. of
Forms 1099
Income
Forms 1099
Income
(1) 1099 Income
entered in
notebooks
and included
in return
35
$ 122,537.40
37
$ 85,000.00
(2) 1099 Income
not entered in
notebooks
or included in
return
17
82,946.30
15
63,024.20
(3) Other Income
entered in
notebooks
and included in
return
350.00
Mr. Metas received all of the Forms 1099 summarized in the preceding chart. He also received Forms 1099 from various racetracks during 1975. The following chart shows the winnings and losses from gambling which Mr. Metas recorded in his notebooks and which *710 were reported in his tax returns for 1972, 1974 and 1975: 1972
1974
1975
PER RETURN: Winnings
$ 122,540.00
$ 85,000.00
$ 23,000.00
Losses
122,030.00
83,613.00
22,800.00
Net Income from
gambling
$ 510.00
$ 1,387.00
$ 200.00
PER NOTEBOOKS: Winnings
$ 122,887.40
$ 85,000.00
Losses
122,378.00
83,613.00
Net Income from
gambling
$ 509.40
$ 1,387.00
Mr. Metas had no notebooks for 1975. The petitioners' reported on their 1972 and 1974 joint Federal income tax returns the following items of gross income: 1972
1974
Wages
$ 7,089
$ 4,481
Interest income
23
24
Gross income from
insurance business
2,388
Gross income from
gambling
122,540
85,000
On Schedules E of their 1972, 1974, and 1975 returns, petitioners reported the following: PART II. RENT AND ROYALTY INCOME. (a) Kind and
Location
of
(b) Total Amount of
(c) Total Amount of
(d) Depreciation
Property
Rents
Royalties
1972 RETURN
Frame House
110 Faith
Street
San Francisco,
California
Joint Venture
NET INCOME
(OR LOSS) FROM
RENTS & ROYALTIES
$ (389)
1974 RETURN
Frame House
110 Faith
Street
San Francisco,
California
See Attached Schedule
NET INCOME
(OR LOSS) FROM
RENTS & ROYALTIES
$ (122)
*711 PART III. INCOME OR LOSSES FROM PARTNERSHIPS, ESTATES OR TRUSTS, SMALL BUSINESS CORPORATIONS. (a) Name and Address
(b) Check Applicable Box
Partnership Estate or
Small Business
Trust
Corporation
1972 RETURN
Liberty Bell & Wm.
Penn. Racing
X
Brandywine Raceway
Less losses
1. TOTALS
2. INCOME (OR LOSS)
1974 RETURN
Brandywine Raceway
Less losses
1. TOTALS
2. INCOME (OR LOSS)
1975 RETURN
Brandywine Raceway
Continental Thoroughbred
Less losses
1. TOTALS
2. INCOME (OR LOSS)
(a) Name and
Address
(c) Employer Identification
(d) Income or
Number
Loss
1972 RETURN
Liberty Bell & Wm.
Penn. Racing
23-1616809
$ 30,302 Brandywine Raceway
51-0070657
92,238 Less losses
(122,030)
1. TOTALS
$ 510 2. INCOME (OR LOSS)
$ 510
1974 RETURN
Brandywine Raceway
51-0070637
$ 85,000 Less losses
(83,613)
1. TOTALS
$ 1,387 2. INCOME (OR LOSS)
$ 1,387
1975 RETURN
Brandywine Raceway
51-0070637
$ 17,185 Continental Thoroughbred
23-1706934
5,815 Less losses
( 22,800)
1. TOTALS
$ 200 2. INCOME (OR LOSS)
$ 200
*712 Petitioners included no other financial information on the Schedules E. Over the years, Mr. Metas became increasingly indebted to his creditors and, by 1976, was unable to repay them. As a result, he filed for personal bankruptcy in that year. Robert M. Goodman made a statement to two special agents of the Internal Revenue Service. Petitioners were not present at the interrogation. The only persons present were Mr. Goodman, the special agents, and a reporter. Goodman was not available to testify at the trial of this case. At the interrogation, Goodman stated that in the late summer of 1974 he began cashing winning racetrack tickets at Brandywine Raceway for people who desired not to have their winnings reported in their names to the Internal Revenue Service. By so doing, Mr. Goodman caused the racetracks to issue Forms 1099 which were false in that they reported the winnings in names other than those of the true winners. According to Goodman, on the evening of August 22, 1974, Mr. Metas approached him and asked whether he (Goodman) would cash a $ 1,370.60 winning ticket which Mr. Metas was holding at the time. Mr. Metas instructed Goodman, if he were questioned about *713 the transaction by the Commissioner's agents, to tell them either that he (Goodman) was just permitting Mr. Metas to hold the money for him or that he owed the money to Mr. Metas. Goodman stated that he cashed the ticket, gave the money to Mr. Metas, and received $ 30 for doing so. Goodman stated that, after the exchange, the Commissioner's agents interviewed him concerning it. He said that he swore to an affidavit on the evening of the exchange to the effect that the ticket was his and that he gave the money to Mr. Metas to hold for him. He also acknowledged in his statement that the affidavit was not true and that he had executed it as part of his and Mr. Metas' prearranged plan in the event that Goodman were questioned. When asked if he knew whether the ticket belonged to Mr. Metas, Goodman replied, "No, it wasn't his ticket. If it was definitely his ticket, he would have cashed it well before that. * * * [I]t was somebody else's. I am sure it was. Somebody gave him the ticket but I don't know who." Mr. Goodman did not make his statement under any grant of immunity from prosecution. In the statutory notices of deficiency, the Commissioner-- (1) determined that *714 petitioners received the following amounts of gambling income: Taxable Year
Income
1972
$ 154,743.90
1974
145,199.00
1975
23,000.00
(2) disallowed all of petitioners' claimed gambling losses for these years (see supra at 7), and (3) determined that part of the asserted underpayments of tax for 1972, 1974 and 1975 were due to fraud. In his Answer, respondent alleged that the correct amount of gambling income for 1972 was $ 205,483.70 rather than $ 154,743.90, an increase in taxable income of $ 50,739.80. Respondent alleged a proportionately higher deficiency as discussed supra at 2. Respondent subsequently filed an amendment to his Answer alleging that the negligence penalty should be imposed upon petitioners for 1975. See discussion supra at 2. OPINION Mr. Metas was engaged in horse racing and other forms of gambling during the years in question. He maintained inaccurate and incomplete records of his gambling income and expenses. During these years, he received Forms 1099 from racetracks which reflected some of his winnings. He had racetrack winnings which were not reported on Forms 1099, and winnings and losses from gambling visits *715 to Las Vegas of which no records were made. For 1972 and 1974, the Commissioner added racetrack winnings reported to him on the Forms 1099 and asserted that petitioners had received gambling income in this amount. He disallowed all of petitioners' claimed losses. For 1975, the Commissioner accepted petitioners reported gambling income but disallowed all of the claimed losses. Issue 1. Admissibility of Goodman Testimony
Petitioner objected at trial to and disputes on brief the admissibility of the statement of Robert Goodman taken in response to questions posed to him by the Commissioner's special agents, described in our findings of fact, supra at 11-12. We admitted the testimony into evidence at trial for the limited purpose of showing that Mr. Metas caused Goodman to cash one of Metas' winning tickets and thereby conceal gambling income from the Commissioner. [2] As petitioner continues to contest the document's admissibility, we will take this opportunity to explain our ruling in greater detail. *716 The document is hearsay because it contains statements made by a declarant (Goodman) other than while testifying at the trial of this case, offered in evidence by respondent to prove their truth. Fed. R. Evid. 801(c). We now determine whether any of the hearsay exceptions are applicable. We accepted respondent's assertion that he was unable in good faith to locate Mr. Goodman and procure his attendance at the trial and that, therefore, Goodman was "unavailable" within the meaning of Fed.R.Evid. 804(a)(5). Under Fed.R.Evid. 804(b)(3), a statement which, at the time it was made, so far tended to subject the declarant to criminal liability that a reasonable man in his position would not have made it unless he believed it to be true, is not excluded by the hearsay rule. Goodman's statements subjected him to a criminal prosecution under section 7206(2) because he admitted to assisting in the preparation of a Form 1099 which was false in that it did not contain the name of the true owner of the winnings which Goodman received in exchange for the ticket he allegedly redeemed for Mr. Metas. *717 See United States v. Rizzo,313 F. Supp. 734 (D. Del. 1970). Accordingly, the document is admissible. The dispute over admissibility is somewhat of a "tempest in a teapot" because, although admissible, Goodman's testimony is not deserving of much, if any, weight. He admitted that he swore to a false affidavit the evening that he was qustioned at the racetrack, drawing into question his credibility, and stated that he was certain that the ticket he cashed did not actually belong to Metas but that Metas was attempting to cash it for another person who was the actual winner. If the ticket did not belong to Metas, its proceeds would not have been income to him and the entire sequence of events would not be relevant to prove that Metas was concealing his income from the Commissioner. As stated previously, the statement is not admissible for any other purpose. Issue 2. Statute of Limitations
Petitioners filed their 1972, 1974, and 1975 Federal income tax returns on or before April 15 of 1973, 1975, and 1976, respectively. The general rule is that the Commissioner must assess tax liability (or mail the statutory notice determining a deficiency) for a *718 taxable year within 3 years after the return is filed or, if later, the date the return was due to be filed. Sec. 6501(a). Thus, under the general rule, the Commissioner had until April 15 of 1976, 1978, and 1979, respectively, to mail the statutory notices for the years in issue. The statutory notice with respect to 1975 was mailed April 13, 1979, and hence within the general 3-year period. The notices for 1972 and 1974, however, were not mailed until April 13 and September 14 of 1979, respectively, and hence not within the general period. Therefore, unless an exception to the general rule applies, the periods of limitations for 1972 and 1974 expired prior to the mailing of the statutory notices and the Commissioner is barred from assessing any additional tax liability for those years. The respondent has the burden of proving that an exception to the general statute of limitations applies. Reis v. Commissioner,1 T.C. 9, 12-13 (1942), modified by a Memorandum Opinion of this Court dated June 4, 1943. The exceptions relevant to our analysis are contained in section *719 6501(c) and (e). Under section 6501(c), tax liability understated on a fraudulent return may be assessed at any time. As discussed in Issue 5, infra, however, respondent has not met his burden of proof that either petitioners' 1972 or 1974 return was fraudulent. Section 6501(e)(1)(A) provides as follows: (a) GENERAL RULE.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph-- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from *720 gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item. Respondent has the burden to show (1) the amount of gross income stated in the return and (2) the amount of income properly includible therein which has been omitted. Davenport v. Commissioner,48 T.C. 921, 928 (1967). In determining the amount of gross income which petitioners have stated in their returns, any statements attached to the individual joint returns, as well as any relevant information returns filed with the Commissioner for partnerships of which petitioners were members, must be considered together with the individual returns. Sec. 6501(e)(1)(A)(ii); Davenport v. Commissioner, supra at 928; Rose v. Commissioner,24 T.C. 755, 768-769 (1955). [3]
In the instant case, respondent has failed to prove the amount of gross income stated by petitioners in *721 their 1972 and 1974 returns because (1) he has not introduced into evidence any relevant partnership returns filed with the Commissioner or any statements attached to petitioners' returns, stating petitioners gross income from the California house (supra at 9) and (2) he has not shown (or produced evidence) that these documents were not in fact filed with the Commissioner. Both the 1972 and 1974 Schedules E list, in Part II, the type of house and its address. Across from this information on the 1972 schedule appear the words "Joint Venture," and, on the 1974 schedule, the words "See attached Schedule." We are, therefore, led to strongly suspect that documents extrinsic to the record stating other gross income of petitioners may indeed have been filed with the Commissioner. The following language from Davenport v. Commissioner,supra at 928, seems to us particularly applicable: Respondent has not shown whether a partnership return was filed for those years and if so the gross income reported thereon. * * * Since there is no evidence indicating the manner in which petitioner arrived at the loss figure for income from the partnership, there is nothing *722 in the record to show petitioner's gross income from the partnership. * * * We therefore conclude that respondent has failed to establish that petitioner[s] omitted from any one of their joint Federal income tax returns for the years * * * [in the instant case, 1972 and 1974] an amount of gross income properly includable therein in excess of 25 percent of the amount of gross income stated in such return and therefore respondent has failed to show that the 6-year statute is applicable.
Issue 3. Deficiency for 1975
In the statutory notice mailed April 13, 1979, the Commissioner disallowed all of petitioners' claimed losses from gambling but accepted the income figure, thus adjusting net income from gambling from $ 200 to $ 23,000. Mr. Metas, at trial, spun an elaborate tale of a unique accounting method which he claims to have used to precisely calculate and accurately report his net income from gambling for each of the years in issue. Petitioner testified that he kept all of his gambling funds in a single strongbox. Whenever he would remove funds to gamble with, he would fill out a "minus" slip indicating the amount removed. When he was through gambling, if he had *723 won more than he wagered, he would tear up the minus slip and substitute for it a slip containing his net gain from the gambling transaction, i.e., the gross winnings less the amount wagered.If he had won nothing, he left the minus slip in the box. He did not specify his procedure in the event that he won some money but less than he wagered. According to Mr. Metas, he used this "strongbox method" to account for the totality of his gambling activities, including the Las Vegas trips as well as horse racing. He acknowledged that the method did not record total gambling winnings or losses, but did accurately measure net winnings and net losses. Mr. Metas stated that after the close of a given taxable year, he would count the amount of money he had left in the box and consider this to be his net profit from gambling. If there was no money left in the box at year end, Mr. Metas concluded that he had suffered a loss. According to his testimony, Mr. Metas would round up as many Forms 1099 that he had received from racetracks as he could find around his house and provide these and the year-end count of money left in the box to his accountant. The accountant would then, according *724 to Mr. Metas, total the amounts recorded on the Forms 1099 and use this sum as the gambling income reported on Schedules E, Part III (see supra at 10). To arrive at the gambling loss figures entered on these schedules, the accountant would simply subtract the "net profit" figure (i.e., the year-end count) from the 1099 gambling income. [4] Thus, Mr. Metas freely acknowledges that the income and loss figures shown on the return are totally inaccurate and bear not even the faintest resemblance to reality but contends that the net profit figure shown thereon is an accurate and comprehensive measure of the financial results of all of his gambling activities for the taxable year. Petitioners bear the burden of proving the extent to which the Commissioner's determination is erroneous. Welch v. Helvering,290 U.S. 111 (1933). As applied to the present case, this doctrine requires petitioners to prove that they in fact incurred gambling losses in some amount. Stein v. Commissioner,322 F.2d 78, 82 (5th Cir. 1963), affg. a Memorandum Opinion of this Court. *725 Petitioners, relying on Green v. Commissioner, 66 T.C. 538 (1976), contend that the fact that this system of accounting recorded only net gains and losses should not prove fatal to their case. As a general proposition, petitioners' contention is true: they may satisfy their burden by satisfactorily showing that their system indeed accurately reflected their net income from gambling. In Green, the taxpayer and his partners operated a gambling casino. Customers were required to use chips in making wagers. No cash was allowed on the gambling tables. Patrons could purchase chips from a "boxman" stationed at each table.When a customer concluded his play for the evening, a "boxman" would exchange any remaining chips for cash. There was no central cashier's cage and the "boxmen" did not record the amounts received for chips nor the amounts paid to redeem chips. The cash in several boxes constituted the gambling bankroll or "kitty." All gambling payouts, amounts paid to redeem chips, as well as all business expenses, e.g., rent, utilities, and food, were paid in cash from the "kitty." The taxpayer was primarily responsible for maintaining partnership records *726 although he had no previous experience or training as a bookkeeper. At the end of each gambling day he and at least one other partner would count the money in the boxes. If, after taking into account all expense disbursements, the amount exceeded the count on the preceding day, the partners would record a "win" and the amount thereof. Conversely, if the amount in the "kitty" was less than the amount present on the preceding day, the difference was recorded as a "loss." The difference represented the net gain or loss for that day without regard to each separate gain or loss from a particular gaming activity. The partnership maintained a daily record of the beginning bankroll, gain or loss from gambling, and operational expenses incurred. This record was maintained by the taxpayer in calendar notebooks for each year of operation. The partnership records thus reflected daily net gains and losses from gambling and the total amount of cash paid for necessary expenses and salaries. This record and all cash receipts for expense items were delivered monthly to an experienced public accountant, who maintained a journal and general ledger for the partnership. With the cash receipts for *727 all expense disbursements, the accountant was able to identify and account for all expense payments noted in the daily record. The partnership daily records, supplemented by cash receipts evidencing payouts, were the sources from which the accountant compiled formal partnership books. Additionally, the accountant prepared Federal employment tax and partnership information returns. The taxpyer in Green also kept a personal record of all partnership gains and losses in a separate notebook. This personal record was maintained in the event the partnership records, which were kept in a desk at the club, were destroyed or stolen. The figures in both notebooks corresponded except that the partnership records were generally more detailed. Green v. Commissioner,supra at 540-542. We considered all of the facts and circumstances, and held that the records maintained by the taxpayer essentially reflected the amount of losses sustained. We pointed out that the taxpayer produced in evidence original records of the partnership which reported wins, losses, expenses, payroll disbursements, distributions to partners, and a running balance of the partnership bankroll. *728 These records were made at the end of each day's activities and constituted a "clear, systempatic, and consistent record of the partnership activities throughout the period in which the Raven Club was open." 66 T.C. at 546. These records were also consistent with the personal records kept by the taxpayer. The daily computations of net gain and loss were made with at least two partners present and were relied upon by other partners in determining their distributive share of the partnership income. Id. We further stated that "[t]he regular disclosure of the daily records to an accountant and the maintenance of a journal and general ledger by the accountant which appear to be unusually complete and accurate for a gambling operation of the kind involved herein have in large measure dispelled any notion of connivance or deceit on the part of the petitioner in reporting his gambling losses," and specifically noted that "from our observation of the petitioner as he testified at the trial, we are satisfied that his testimony concerning his business affairs was * * * trustworthy and credible." 66 T.C. at 547.We concluded that in the context of a casino operation *729 "failure to account for gross receipts and gambling disbursements does not warrant total disregard of the daily net loss figures where, as here, it is shown that those amounts were obtained from orderly records and, when subtracted from the amounts reported as net wins, are sufficient to calculate * * * net income." 66 T.C. at 548. See also Rainwater v. Commissioner,23 T.C. 450, 457 (1954), in which we found credible the taxpayer's testimony that the daily summary sheets of a bookmaking operation, upon which returns were based, were used by him and his partners in dividing the profits. We considered this fact "of pivotal significance." Also Nemmo v. Commissioner,24 T.C. 583, 592-593 (1955), revd. on another issue sub nom. Polizzi v. Commissioner,247 F.2d 875 (6th Cir. 1957). We pointed out in Green,supra at 545-546, that the question of the amount of losses sustained in a gambling operation is one of fact to be determined from a scrutiny of the entire record. We further distinguished cases with different factual settings, e.g., Delsanter v. Commissioner,28 T.C. 845, 856-857 (1957), *730 where we refused to accept taxpayer's records because no original records were produced and we did not find his testimony credible. Also McGrath v. Commissioner,27 T.C. 117, 125-128 (1956) (records not accepted because testimony not credible).It is thus clear that whether we accept a petitioner's records and purported accounting system as accurate and reliable depends upon the facts of each case and upon the credibility of the taxpayer. Nemmo v. Commissioner,supra at 593. We find our present situation entirely distinguishable from Green. Mr. Metas presented absolutely no original records from 1975, not even any of the "plus" and "minus" slips. Even if we accepted his testimony that he actually used the "strongbox method," we have serious doubts as to the capability of any such system to accurately reflect net income. Mr. Metas' testimony was very incomplete in specifying what procedures he used to insure accurate computations of amounts won and lost; he claimed that he made no expenditures for personal items from the box but did not specify how he kept from doing so. Many other weaknesses in such a system could be pointed out if *731 we were persuaded that Mr. Metas in fact employed it; we simply do not, however, find credible Mr. Metas' testimony that he actually used a box and slips to even attempt to comprehensively record his gambling income. We base this conclusion primarily upon the fact that the notebooks for 1972 and 1974, submitted in evidence by petitioners and acknowledged by Mr. Metas to be inaccurate and incomplete, reflect the same amount of net income from gambling as is shown on the returns for those years. See supra at 7. It seems to us highly unlikely that by some wonderfully mysterious coincidence the "comprehensive" strongbox method would generate the same bottom line figure as the notebooks, which purport to record only recetrack gambling income and losses. The trustworthiness and reliability of Mr. Metas' recordkeeping system can rise no higher than the credibility of his testimony, especially because he has submitted no actual original records. Stein v. Commissioner,322 F.2d 78, 82 (5th Cir. 1963), affg. a Memorandum Opinion of this Court. We consider it more likely, and find, that Mr. Metas prepared the notebooks from the "hodgepodge" records he kept and then *732 used them to arrive at either the net profit figure or the total loss figure, which he then provided to his accountant along with the Forms 1099. It is true that no notebook was submitted for 1975 and so it is possible that Mr. Metas actually began using the box in that year. However, as explained supra, we do not find credible his testimony [5] concerning 1972 and 1974 and see no reason to accord it more credence as it might relate to 1975. We thus conclude that petitioners have not carried their burden of proving the Commissioner's determination of their 1975 gambling net income erroneous. *733 Issue 4. Cohan Estimate
Petitioners urge that, even should we find (as we have) that no acceptable records of 1975 gambling income and losses were kept, we should nevertheless estimate and allow petitioners to deduct some amount of gambling losses under Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). We are unable to apply Cohan in this case because we have no rational basis for doing so. We simply have no evidence as to what petitioners' actual losses were. Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957). Furthermore, the $ 23,000 gambling income figure reported on petitioners' 1975 return was by Mr. Metas' own admission merely the sum of the winnings reported on the Forms 1099 which he was able to find and give to his accountant. He, therefore, may have had other reported winnings for which he did not find the Forms 1099. He also by his own testimony had many winnings not reported on Forms 1099. In this situation, even substantiated losses [6] are not deductible unless it is shown that they exceed the unreported winnings which the Commissioner has not included in the taxpayer's income. Schooler v. Commissioner, 68 T.C. 867, 869 (1977). *734 [7]
We conclude, as did the court in Plisco v. United States, 306 F.2d 784, 787 (D.C. Cir. 1962), that "there are no reliable figures from which to calculate or extrapolate a reasonable estimate of [petitioners'] losses * * *." We accordingly sustain respondent's disallowance of petitioners' $ 22,800 claimed gambling losses for 1975.
Issue 5. Fraud for 1972 and 1974
The respondent has asserted fraud additions to tax against petitioners under section 6653(b) for the taxable years 1972 and 1974. In order for us to sustain these additions to tax, respondent has the burden of proving for each taxable year in issue, by clear and convincing evidence, that (1) there was an underpayment of tax, and (2) some part of such underpayment was due to fraud. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and *735 Procedure; Cefalu v. Commissioner, 276 F.2d 122 (5th Cir. 1960). Thus, proof by clear and convincing evidence of some underpayment is a necessary element of respondent's affirmative case, and not merely circumstantial evidence of fraudulent intent. [8]Holland v. United States, 348 U.S. 121, 125, 128, 132-139 (1954); United States v. Johnson, 319 U.S. 503, 516-518 (1943); Pigman v. Commissioner, 31 T.C. 356, 370 (1958). Respondent may not use a taxpayer's mere failure to prove error in the Commissioner's determination of a deficiency as evidence in establishing this element. Pigman, supra at 370; Otsuki v. Commissioner, 53 T.C. 96, 106 (1969). Respondent has not shown by clear and convincing evidence that petitioners in fact underpaid their 1972 or 1974 Federal income tax liability. He has shown simply that petitioners had gambling winnings which they did not report. See supra at 6. He has not shown, however, that petitioners had unreported taxable income from gambling. Gambling losses, of course, must be deducted from gambling gains in order to arrive at taxable income *736 from gambling, and respondent has not introduced any evidence (e.g., net worth computation, bank deposits, etc.) that petitioners' income was substantially more than that reported on their return and that such unreported income had a likely taxable source. It may very well be that petitioners' gambling losses greatly exceeded gambling gains--indeed, in 1976 Mr. Metas declared personal bankruptcy. It is true that Mr. Metas submitted into evidence notebooks for 1972 and 1974 purporting to record both gambling wins and gambling losses. However, Mr. Metas himself stated that they were "hodgepodge," inacurate records, and respondent assails them most uncivilly as deliberate fabrications intended to obfuscate revenue agents. Respondent may not in the same breath slander the veracity of these notebooks and proclaim them as establishing maximum amounts for losses. The notebooks are simply no evidence of any understatement of taxable income. We, therefore, conclude that respondent has not carried his burden of proving *737 fraud on the part of Mr. Metas by clear and convincing evidence for 1972 and 1974. Thus, as discussed supra at 17, the assessment of Federal income tax liability for these years is barred by the statute of limitations. Issue 6. Negligence for 1975
Respondent determined in his statutory notice for 1975, mailed April 13, 1979, that petitioners were liable for a section 6653(b) (fraud) addition to tax for 1975. In his Amended Answer, respondent asserted that petitioners were liable for a section 6653(a) (negligence) addition to tax for 1975. He does not contend for, or even mention, a fraud addition to tax on brief, but argues only for imposition of a negligence addition to tax. Because respondent raised the issue of negligence for the first time on brief, it is "new matter" on which respondent bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.
As we explained in detail under the caption of Issue 3 above, we have found that petitioners underpaid their income tax for the taxable year 1975. This finding establishes the fact of underpayment without the introduction of additional proof by respondent. In addition, the respondent must *738 prove that some part of the underpayment resulted from petitioners' negligence or intentional disregard of the rules and regulations. As we have explained in detail under the caption of Issue 3 above, Mr. Metas' records for 1975 were wholly inadequate to reflect taxable income for that year. The failure to maintain adequate books and records is negligence.Respondent has therefore, sustained his burden of proving negligence for 1975. Decisions will be entered under Rule 155 in docket Nos. 10094-79 and 10096-79.
Decision will be entered for the petitioner in docket No. 16834-79.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. The document was not admitted for the purpose of impeaching Mr. Metas as a witness by proving specific instances of misconduct. Under F.R. Evid. 608(b)↩, one may not prove by extrinsic evidence specific instances of a witness' misconduct in order to attack his or her credibility. The document is accordingly not admissible for this purpose and has not been considered by us except as explained above.
3. Belcher v. Commissioner,T.C. Memo. 1958-180↩.
4. The accountant presented a slightly different version. He claimed that, rather than a net profit figure, Mr. Metas provided him with a loss figure. We accord little significance to this discrepancy because, as stated infra,↩ we simply do not believe any of Mr. Metas' testimony concerning the strongbox method of keeping track of his gambling net income and loss.
5. We note other discrepancies in Metas' testimony. When asked about Goodman, Metas initially replied, "I don't know him personally. I know of him." Later, in attempting to keep Goodman's testimony out of the record, Metas exclaimed that "Goodman was a known liar * * * a criminal. He didn't work. He was on probation. He would say anything to stay out of jail. Mr. Goodman went to court when I was indicted in Wilmington * * * and the charges were all dismissed without prejudice." Metas later stated, "What I have to say about Mr. Goodman: Mr. Goodman and I were already in court in Wilmington, Delaware. He accused me of giving ---." Mr. Metas certainly exhibited unusually strong opinions concerning someone he claimed not to know personally. At one point during the trial, respondent's counsel and this Court were attempting to ascertain whether Mr. Metas used funds from his alleged strongbox for personal expenses such as meals and lodging. This line of questioning ended with the following colloquy: Q. When you went out to Vegas, did you pay for your stay in Vegas at the casinos with cash?
A. No. I didn't have to pay when I went out there. One time I may have paid on a charge card. That is when I stayed at the Tam O'Shanter. I never stayed there long enough to have to pay for any rent because I never slept. I just stayed up around the clock. I didn't sleep. Q. Well, do you recall testifying earlier that sometimes you would go out for a weekend, and if you hit it you would stay for the week? A. If I had any -- if I won any money, I would, yes, if I didn't have to work. Q. Are you telling the Court that you would stay awake seven days without sleep? A. No, I didn't stay awake seven days. If I had of stayed there seven days, I would had to have a place to stay. Q. All right. And since you were going out of your own expense at all times except for the one junket, you would have to pay for the rooms? A. Sure, I would. But I didn't pay. I can't recall paying any.↩
6. Petitioners have produced no evidence, such as losing tickets, substantiating any of Mr. Metas' claimed losses for 1975. ↩
7. Glazer v. Commissioner, T.C. Memo. 1980-337; DeMonaco v. Commissioner, T.C. Memo. 1981-17↩.
8. Repeated understatements of income constitute evidence from which fraud may be inferred. Marinzulich v. Commissioner,31 T.C. 487, 490↩ (1958).