TIBOR I. SZKIRCSAK and E. MARIE SZKIRCSAK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Szkircsak v. Commissioner
Docket No. 9813-77.
United States Tax Court
T.C. Memo 1980-129; 1980 Tax Ct. Memo LEXIS 457; 40 T.C.M. (CCH) 208; T.C.M. (RIA) 80129; April 21, 1980, Filed *457 Held, petitioners are entitled to deduct gambling losses in amount determined by the Court. Tibor I. Szkircsak and E. Marie Szkircsak, pro se. Brad S. Ostroff, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency of $2,884.57 in petitioners' Federal incofme tax for 1975. Due to concessions, the sole issue for decision is whether petitioners have substantiated gambling losses equal to or in excess of their winnings from gambling during the taxable year. *458 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Tibor I. (Tibor) and E. Marie (Marie) Szkircsak are husband and wife who, at the time of the filing of the petition herein, resided in Phoenix, Ariz. Petitioners timely filed their joint Federal income tax return for the taxable year 1975. During 1975 Marie was employed as a telephone operator for Mountain Bell Telephone. Marie was paid bi-monthly and received $6,896.45 as wages during the taxable year in issue. During 1975 Tibor operated as a sole proprietorship a business entitled "Tibor Signs." Based on petitioners' concessions of the schedule C adjustments made by respondent in the statutory notice of deficiency, Tibor Signs operated at a loss of $304.25 during the taxable year in issue. During the taxable year, petitioners attended on a weekly basis various dog tracks in the Phoenix area. The number of nights they would spend at the track per week varied between two and five. When petitioners went to the track they usually attended only the last two races. It *459 was during the last two races that the track offered a high-odds betting proposal named the "Big Q." Petitioners confined their wagers solely to the Big Q, and did not bet on individual races.
During 1975 petitioners won $13,967.80 on two Big Q bets. In March petitioners won a Big Q of approximately $13,220 and later in the year petitioners won another Big Q for the balance of the winnings. Other than the above, petitioners won no other wagers at the dog tracks during the taxable year in issue. On three separate occasions during 1975--March 28-30, April 19-21, and June 13-18--petitioners traveled to Las Vegas to gamble at the casinos. All three trips were unsuccessful, and petitioners sustained losses on each occasion. On their 1975 Federal income tax return, petitioners reported $13,967.80 as gambling winnings. This amount represented winnings from the two Big Q's for which the racetracks issued Informational Returns (Form 1099). On the same return, petitioners deducted $13,967.80 of a $15,645 gambling loss claimed to have been sustained during that taxable year.
Petitioners kept a daily record of their profits and losses from betting at the dog tracks. In their racing program, *460 they would enter the amount bet on each race and indicate whether they won or lost. Upon returning home from the track, Marie would net the losses against the profits (if any), and enter the net amount on a daily summary sheet. At the end of each month, petitioners would total their daily profit or loss and enter the total net gain or loss for the month on a summary sheet. After entering this monthly recapitulation, petitioners destroyed the racing programs and daily statements. Petitioners did not calculate their losses in Las Vegas on a daily basis. Upon returning to Pheonix from each of their Las Vegas excursions, Marie would enter the amount of the gambling losses sustained during that trip on the monthly summary with their racetrack losses. The amount entered was arrived at by adding the amounts of checks cashed in Las Vegas to the amount of cash with which they started, and subtracting therefrom any cash they had upon their return. At trial petitioners introduced into evidence a handwritten copy [1] of their monthly summary sheet for 1975. This copy was made in early 1976 and is summarized as follows: *461 Date
Place
Loss
Jan. 1975
Greyhound Park
$ 560
Feb. 1975
None listed
340
Mar. 1975
None listed
1,200
Mar. 28-30,
1975
Las Vegas
3,100
April 1975
Apache Park
2,025
April 19-21
1975
Las Vegas
4,000
May 1975
Apache Park
300
June 1975
Apache Park
500
June 13-18,
1975
Las Vegas
2,150
July 1975
Black Canyon Park
450
Aug. 1975
None listed
175
Sept. 1975
Black Canyon Park
280
Oct. 1975
None listed
500
Dec. 1975
None listed
65
According to this statement, petitioners sustained a loss of $6,395 and $9,250 from gambling at dog tracks and Las Vegas, respectively, during 1975.
A total of 10 checks were cashed by petitioners immediately before of during their trips to Las Vegas. Of these checks, which totaled $4,475, five were made payable to cash and five to Able Check Cashing Co. The checks made payable to cash were negotiated in Arizona, while the checks made payable to Able Check Cashing Co. were negotiated in Las Vegas. On April 22, 1975, upon returning home from one of their trips of Las Vegas, petitioners cashed a check for $500.On June 18, 1975, also immediately after returning home from Las Vegas, petitioners borrowed *462 $775.27 from the Dial Finance Co. In the statutory notice of deficiency dated June 30, 1977, respondent disallowed in full the gambling loss claimed, the stated reason being, "[petitioners] have not shown that losses were sustained." There was no determination that petitioners had realized unreported gross gambling winnings.
ULTIMATE FINDING OF FACT Petitioners sustained losses from gambling in the amount of $5,840 during 1975. OPINION The only question for our determination is whether petitioners are entitled to a deduction for gambling losses. On their 1975 Federal income tax return, petitioners reported gambling winnings from racetracks in the amount of $13,967.80 and offsetting losses in a like amount. Respondent contends that no deduction for gambling losses is allowable as petitioners have not established that losses were in fact sustained.
Section 165(d) allows a deduction for losses from wagering transactions to the extent of gains therefrom. Petitioners have the burden of proving that their alleged losses were in fact sustained; the issue is one of fact to be decided on the basis of the evidence adduced and the weight given thereto. Schooler v. Commissioner, 68 T.C. 867 (1977); *463 Green v. Commissioner, 66 T.C. 538 (1976); Showell v. Commissioner, 23 T.C. 495 (1954), remanded 238 F. 2d 148 (9th Cir. 1956). Marie was the sole witness on behalf of petitioners. A handwritten copy of a monthly summary sheet reflecting net losses per month taken from daily records which were subsequently discarded was introduced as evidence to substantiate the amount of their losses. Petitioners were unable to produce other records, such as the daily summaries and unredeemed betting tickets, on which they claim their monthly summary was based. Additionally, 10 checks cashed by petitioners immediately before and during gambling trips to Las Vegas were introduced into evidence. To begin, we believe considerably more documentation is needed to adequately substantiate gambling losses than that introduced in evidence.The monthly summary sheet, explained by Marie's testimony, is of some help, but it does not reflect the time, place, or amount of any specific gambling loss. Secondly, we have serious doubts regarding the accuracy of the summary. While petitioners have stated that their monthly totals accurately reflected net losses *464 by the month, we do not believe this is the case. In March petitioners won approximately $13,200 on the Big Q, yet their summary indicates a loss of $1,200 for that month. If their records are to be believed, this would indicate that petitioners sustained $14,400 in losses for that month at the racetrack. This is not consistent with Marie's testimony and furthermore, with the exception of one other month, petitioners' losses from racetrack gambling never exceeded $600 in any one month. Finally, this document is merely a summary of taxpayers' records made after the year in issue. The original records upon which this summary was based were destroyed by the taxpayers and, therefore, it is impossible for either respondent or this Court to verify any amounts listed therein. At best, this summary is little more than a noncontemporaneous, unsworn statement by the taxpayers as to the amount of their losses, and, as such, is entitled to little evidentiary weight. We also do not find that the cancelled checks conclusively establish the amount of petitioner's gambling losses at Las Vegas. Although we are certain that some of the funds so obtained went for gambling, the face amount *465 on the checks give us no clue as to that amount, because personal expenditures to and from Las Vegas and while there must be presumed. While there is no ironclad rule to establish conclusively losses from gambling, we believe, absent mitigating circumstances, taxpayers should at least offer a fairly contemporaneous record of their wagering transactions. See, for example, Green v. Commissioner, supra.[2] A mere summary of losses prepared at the end of the year, rather than during the normal course of a taxpayer's business and unsupported by records of original entry, is inadequate for tax purposes. Showell v. Commissioner, supra; Stein v. Commissioner, 322 F. 2d 78 (5th Cir. 1963), affg. a Memorandum Opinion of this Court. We do not believe that asking for contemporaneous records imposes too great a hardship on petitioners or others gamblers similarly situated. Section 6001 imposes a duty on every taxpayer to keep sufficient records verifying all matters required to be shown on the return. The records submitted in this case fall far short of meeting *466 this requirement. Although we do not find petitioners' records adequate to determine the amount of the gambling loss, we are convinced that a loss in excess of that allowed by respondent was in fact sustained during the taxable year. Marie testified in a forthright and candid manner, and we have a good deal of confidence in her credibility. Her testimony is corroborated by the fact that large amounts of checks were cashed immediately before and during their trips to Las Vegas.This evidence, together with the fact that on return from Las Vegas petitioners obtained loans or cashed additional checks for funds, patently suggests that their gambling excursions met with little success. Based on the testimony and the other evidence from the record, this Court is competent to determine the amount of the loss under the approximation rule laid down in Cohan v. Commissioner, 39 F. 2d 540 (2d Cir. 1930); see also Showell v. Commissioner, supra; Drews v. Commissioner, 25 T.C. 1354 (1956). Petitioners offered no evidence as to the average amount bet on each race.Although we can only approximate, we believe this amount to be in the neighborhood *467 of $15. Based on an average attendance of 3 times weekly, we find that petitioners incurred losses of $2,340 from racetrack gambling during the taxable year. Additionally, we find that petitioners sustained a loss of $3,500 from gambling in Las Vegas during 1975.We reach this conclusion by deducting $975, as being for personal expenditures, both during and after their Las Vegas trips, from the face amount of the cancelled checks that petitioners introduced into evidence. Respondent additionally argues that petitioners have not established that their losses from gambling did not exceed their unreported gambling winnings for the taxable year. Respondent challenges the adequacy of proof because Marie admitted that while playing "craps" in Las Vegas there were occasions when she won certain individual rolls of the dice. From this respondent concludes that petitioners had unreported gambling winnings and, therefore, cannot prevail. He relies on Donovan v. Commissioner, 359 F. 2d 64 (1st Cir. 1966), affg. a Memorandum Opinion of this Court, and Schooler v. Commissioner, supra.
In Donovan and Schooler, the gambling loss deductions were *468 disallowed in full because there were admittedly additional unreported winnings and no convincing proof that the losses from gambling exceeded the unreported gains. The rule of Cohan was held inapplicable since there was no basis for estimating whether the taxpayer's losses exceeded the unreported gains. See also Zooloomian v. Commissioner, 417 F. 2d 1337 (1st Cir. 1969), affg. a Memorandum Opinion of this Court. In distinction, here respondent has allowed no gambling losses unless it can be shown that petitioners had unreported gambling income against which losses were netted. There is little evidence in the record relating to unreported gains, and we believe this paucity of evidence may be due to respondent's failure to specifically inform petitioners by statutory notice, or otherwise, that he was relying on this argument as a basis for his disallowance of the claimed gambling losses. The only evidence bearing on this issue is the testimony of Marie. Marie repeatedly stated that the only winnings from gambling consisted of the two Big Q wagers which were reported on the return. As stated before, we believe Marie was candid and forthright. Her testimony *469 is credible in light of the fact that the record indicates that the only racing wagers made during the taxable year were on the high-odds Big Q wagers. Therefore, it is not inconceivable that petitioners would have only two wins to show for numerous wagers. Respondent points to a statement by Marie which indicates that she occasionally won wagers on individual rolls of the dice at Las Vegas as conclusively showing that there were unreported gambling winnings. We believe this conclusion far fetched. Although we recognize that there is a duty to report gambling winnings even if there is a net loss, McClanahan v. United States, 292 F. 2d 630 (5th Cir. 1961), we believe respondent carries this rule too far, for it is impractical to record each separate roll of the dice or spin of the wheel. Since Marie has testified that she always incurred a loss upon leaving the table, we do not believe, as respondent suggests, that her statement is tantamount to an admission that there was unreported gambling income. (Cf. Green v. Commissioner, supra at 548; the difference between daily wins and losses constitutes gross income.) Had respondent offered evidence *470 such as an increase in petitioners' net worth or unexplained bank deposits to support his argument that petitioners had additional unreported gambling winnings, we would expect petitioners to offer evidence corroborating their own testimony that they had no unreported gambling winnings. However, here respondent's argument is based entirely on Marie's testimony that she occasionally had a winning roll of the dice, which she adequately explained did not make her a winner on those particular days. It is always difficult to prove a negative, see Schildhaus v. Commissioner, T.C. Memo. 1969-283, and it would be almost impossible for petitioners to prove conclusively that they had no unreported gambling income at Las Vegas except through their own testimony. Furthermore, they were not adequately advised by respondent in advance of the trial that he would rely on this argument. Under the circumstances, and since Marie's testimony on this subject was uncontroverted, consistent, and believable, we find that petitioners realized no additional income from gambling in 1975. Therefore, Schooler and Donovan are distinguishable and pose no bar to our application of the *471 Cohan rule. Decision will be entered under Rule 155. Footnotes
1. The original monthly summary was not introduced into evidence. Petitioners did not bring the original to the trial as it "was ragged."↩
2. See also Greenfeld v. Commissioner, T.C. Memo. 1966-83↩.