MAE SORRENTINO SNEED (formerly MAE SORRENTINO), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sneed v. Commissioner
Docket No. 15896-79.
United States Tax Court
T.C. Memo 1982-254; 1982 Tax Ct. Memo LEXIS 489; 43 T.C.M. (CCH) 1325; T.C.M. (RIA) 82254; May 6, 1982. Peter R. Stoll, for the petitioner. Edgar Gonzalo Rios, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Chief Judge: Respondent determined the following deficiencies in petitioner's *490 Federal income taxes and additions to tax: Underpayment
Section 6653(b) [1]
Year
of Tax
Addition to Tax
1968
$ 6,864.10
$ 3,432.05
1969
5,310.76
2,655.38
The issue we must decide is whether any part of the underpayment of tax for 1968 or 1969 is due to fraud within the meaning of sections 6501(c)(1) and 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Mae Sorrentino Sneed (Ms. Sneed), timely filed her 1968 and 1969 Federal income tax returns. At the time she filed her petition in this case, petitioner resided in Oxnard, California. When she was approximately 35 years old, petitioner accepted a job as a power sewing machine operator. Subsequently, petitioner was approached by Ben Feinberg, the owner of a ladies' coat factory, in Oxnard, California, called Cindy-Lou of California (Cindy-Lou), who requested that she manage a garment factory he was planning *491 to open in Ventura, California, called Sherry-Lee of California (Sherry-Lee). Petitioner accepted his offer and became responsible for the hiring and training of sewing machine operators. While she was managing Sherry-Lee, petitioner was not involved in the office work, bookkeeping, billing, or handling of money. In December 1966, Mr. Feinberg shut down both Cindy-Lou and Sherry-Lee. Petitioner then took a job as a machine operator in Los Angeles. Early in 1967, Mr. Feinberg contacted petitioner to inquire if she was interested in purchasing Cindy-Lou. Petitioner formed a partnership with Harry Meadows, who Mr. Feinberg had indicated might be interested in investing in the business, and Randy Resendez, a close acquaintance of petitioner, to acquire Cindy-Lou. The name of Sherry-Lynn of California (Sherry-Lynn) was adopted and business commenced in April of 1967. Petitioner immediately began orienting a crew of machine operators. Mr. Resendez set up Sherry-Lynn's office. Shortly thereafter, the firm of Dering & Crippen, C.P.A. was retained to set up an accounting system for, and maintain the books and records of, Sherry-Lynn. Although Mr. Dering met with petitioner *492 four or five times in 1967 to discuss setting up the system and to explain the basic principles of original entry bookkeeping, James Hanks, an employee of Dering & Crippen, was responsible for actually setting up the accounting system and updating the books and records. While Mr. Resendez was associated with Sherry-Lynn, Mr. Hanks dealt primarily with him, rather than with petitioner. Additionally, from 1967 through 1969, Sherry-Lynn employed a series of three office clerks, Lois Garver, a woman named Barbara, and Diane Lane, to prepare the payroll, bank deposits, payroll tax returns, and invoices. Mr. Hanks generally obtained the records he needed from these office clerks. Ms. Sneed did not maintain Sherry-Lynn's books and record, although she made some of the bank deposits and signed some of the checks. Three months after Sherry-Lynn began operations, Mr. Meadows withdrew from the partnership. At all times relevant hereto, Sherry-Lynn primarily sewed and assembled pre-cut cloth into women's clothing. The pre-cut material was provided by various companies referred to as jobbers. When the garments were completed, they were returned to the jobber with an invoice for the work *493 done. Generally, the jobber gave the truck driver a check in the amount of the invoice which the driver, in turn, delivered to Sherry-Lynn. Beginning in 1968, the jobbers paid Sherry-Lynn an additional five cents per garment as a freight allowance. This freight allowance was generally paid by a separate check. During 1968, Sherry-Lynn did work for two jobbers: Holly-Mode of California (Holly-Mode) and Milson of California (Milson). In 1969, Sherry-Lynn did work for Milson, University Sportswear, and Boutique Fashions. The only income generated by Sherry-Lynn was from the work for these jobbers. In February of 1968, Mr. Resendez terminated his association with Sherry-Lynn and started a new business called Roma-Lee of California (Roma-Lee) which, like Sherry-Lynn, sewed and assembled pre-cut fabric into women's garments. During 1968 and 1969, petitioner, in order to assist Roma-Lee in obtaining work, would subcontract to it work which Milson and University Sportswear had given to petitioner. In such instances, petitioner would receive payment directly from the jobbers for the work done and would, in turn, write a check to Roma-Lee in the amount received from the jobber. Petitioner *494 maintained a general checking account, a payroll checking account, and a tax account for Sherry-Lynn at the Channel Islands State Bank. Petitioner's personal accounts consisted of a checking account and several savings accounts. The savings accounts were maintained either jointly with one of her children or by petitioner as trustee for one of them. For several months in 1969, petitioner and John Sorrentino (petitioner's son) maintained an additional checking account for Sherry-Lynn at Security First National Bank. All the money Sherry-Lynn received from its jobbers was not deposited into Sherry-Lynn's bank accounts. During 1968, Sherry-Lynn received slightly over 200 checks from Milson for garments and freight. When 13 of these checks were deposited, cash totaling $ 6,638.56 was withheld from the deposits. Several of the deposit slips for these "less cash" deposits bear no signature. The remaining slips are signed by either Lois Garver, John Sorrentino, or petitioner. Likewise, cash totaling $ 450 was withheld from two checks written by Holly-Mode to Sherry-Lynn. Ten checks issued by jobbers to Sherry-Lynn in 1968, totaling $ 9,168.25, were deposited to a Channel Islands *495 Bank account in the name of Mae Sorrentino. In 1968, petitioner reported the income from Sherry-Lynn as income from a sole proprietorship. Mr. Hanks prepared petitioner's 1968 Federal tax return. Neither petitioner, Sherry-Lynn's office clerks, nor Mr. Resendez (while he was with Sherry-Lynn) maintained a general ledger or a cash receipts journal. Mr. Hanks could not locate copies of all Sherry-Lynn's sequentially pre-numbered invoices used in 1968. The total of those invoices which were located was less than Sherry-Lynn's bank deposits for that year. Mr. Hanks discussed the situation with petitioner, who instructed Mr. Hanks to use the larger amount as Sherry-Lynn's gross receipts. Accordingly, Mr. Hanks totaled the deposits per the bank statements for the three accounts and eliminated inter-account transfers in order to arrive at gross receipts. Because of the manner in which Mr. Hanks calculated gross receipts, any cash withheld from deposits and any checks not deposited into Sherry-Lynn's accounts were excluded from gross receipts. Although petitioner was aware that, for 1968, Sherry-Lynn's gross receipts were calculated from bank deposits, she did not inform Mr. Hanks *496 that all business receipts were not deposited into the business accounts. Petitioner and her son, John Sorrentino, formed a partnership in 1969 to operate Sherry-Lynn. In mid-1969, petitioner terminated Dering & Crippen as her accountant and on the recommendation of her bookkeeper, Diane Lane, hired Robert Herzog, C.P.A. Mr. Herzog prepared a schedule of invoices to reflect Sherry-Lynn's gross receipts for the first half of 1969. The schedule omitted 16 invoices to University Sportswear and Boutique Fashions totaling approximately $ 15,000. Later in 1969, petitioner discharged both Mr. Herzog [2] and Diane Lane and rehired Dering & Crippen. Mr. Hanks, of Dering & Crippen, completed, for the remainder of 1969, the schedule begun by Mr. Herzog. Mr. Hanks used this schedule of invoices plus an amount for freight income equal to 5 cents per assembled garment as Sherry-Lynn's gross receipts for 1969. Petitioner's 1969 Federal tax return and Sherry-Lynn's partnership return for that year were prepared by Mr. Hanks. Petitioner failed to provide Mr. Hanks or Mr. Crippen with the aforementioned 16 missing invoices. *497 In the preparation of petitioner's income tax returns for 1968 and 1969, amounts received from University Sportswear or Milson for work subcontracted to Roma-Lee were not included in Sherry-Lynn's gross receipts. Nevertheless, payments to Mr. Resendez or to Roma-Lee of $ 6,765 and $ 4,892, in 1968 and 1969, were deducted by Sherry-Lynn as "purchased services." In 1969, Roma-Lee was closed due to its failure to pay certain taxes owing to the Internal Revenue Service. A jobber whose unfinished work was in Mr. Resendez' shop contacted petitioner and requested that she complete the garments. Ms. Sneed contacted the Internal Revenue Service and, with their permission, took the work from Roma-Lee's shop and finished it at Sherry-Lynn. Money received for the work was deposited in the Commercial and Farmer's Bank under petitioner's name. Petitioner turned over the net proceeds (after deducting the cost of completing the work) to the Internal Revenue Service. [3]
*498 During the course of respondent's investigation, petitioner met with respondent's agents on several occasions from 1970 through 1973. Petitioner's statements on these occasions were false, misleading, and inconsistent. Petitioner's underpayments of tax in 1968 and 1969 were due to fraud. OPINION Respondent has determined that (1) petitioner understated gross receipts from her sole proprietorship, Sherry-Lynn, in the respective amounts of $ 8,035.76 and $ 17,503.70, for 1967 [4] and 1968, respectively; and (2) the gross receipts of Sherry-Lynn, a partnership, were understated in the amount of $ 13,595.37 in 1969 with the consequence that petitioner's distributive share of partnership income was understated by $ 10,196.78. Respondent also asserts additions to tax pursuant to section 6653(b) based upon the fraudulent omission of taxable income from petitioner's returns. Petitioner *499 concedes that Sherry-Lynn's gross receipts were understated in 1967, 1968, and 1969. Nevertheless, in the absence of fraud, the normal three-year statute of limitations has expired on assessment of the deficiencies. See section 6501(a) and (c)(1). Respondent has the burden of proving petitioner's fraud by clear and convincing evidence. Section 7454(a); Rule 142(b). To establish fraud, the Commissioner must show that petitioner intended to evade taxes, which she knew or believed she owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Danenberg v. Commissioner,73 T.C. 370, 393 (1979). The issue of fraud is factual and is determined upon the basis of the entire record, Grosshandler v. Commissioner,75 T.C. 1, 19 (1980), considered in light of our evaluation of the credibility of the witnesses whom we saw and heard. Although mere suspicions are not sufficient to sustain a finding of fraud, Green v. Commissioner,66 T.C. 538, 550 (1976), direct evidence of fraudulent intent is seldom available and we are entitled to draw reasonable inferences from the conduct of the taxpayer and the *500 surrounding circumstances, Grosshandler v. Commissioner,supra.
Respondent alleges the folowing points which he contends are sufficient to sustain a finding of fraud: (1) petitioner's gross income was understated in 1967, 1968, and 1969; (2) petitioner deliberately withheld information from her accountants which was necessary for the preparation of true returns; and (3) during the course of respondent's investigation, petitioner made false and misleading statements to respondent's agents. Petitioner, although conceding that her income in 1967, 1968, and 1969 was understated, insists that the understatements were the result of innocent mistakes. Based on our evaluation of the entire record, particularly with respect to the credibility of the witnesses, we conclude that petitioner's underpayments of tax in 1968 and 1969 were due to fraud. Petitioner's underpayments did not result from mere carelessness or oversight but rather were attributable to the evasion of her obligation to account for and report her total income. "[C]onsistent understatements of income in substantial amounts over a number of years by knowledgeable taxpayers, standing alone, are persuasive *501 evidence of fraudulent intent to evade taxes." Otsuki v. Commissioner,53 T.C. 96, 108 (1969). Respondent, at trial, presented evidence in his effort to establish petitioner's understatement of gross income and the accompanying underpayment of tax. At the end of trial, petitioner conceded that her gross income was understated. We do not believe that, under the circumstances of this case, petitioner's concession on this matter vitiates respondent's use of the consistent understatements as evidence of fraud. Furthermore, although the understatements of $ 8,035.76, $ 17,503.70, and $ 10,196.78 may seem insubstantial when compared with Sherry-Lynn's reported gross receipts of $ 114,021, $ 353,203, and $ 388,511, when compared with petitioner's reported loss of $ 6,229 in 1967 and taxable income of $ 28,877 and $ 25,362 in 1968 and 1969, the understatements are substantial. Petitioner attempts to explain the understatements as innocent, attributable to the many demands Sherry-Lynn placed on her time and energy. We simply cannot accept petitioner's explanation. On four separate occasions from March 1970 to February 1973, petitioner gave statements to respondent's agents *502 concerning this case. Those statements are inconsistent with one another and with petitioner's testimony at trial. Petitioner's various explanations are also squarely contradicted by documentary evidence and by the statements of petitioner's accountant, James Hanks, whom we found to be a credible witness. The contradictions and inconsistencies in petitioner's statements are too many and too serious to be attributable to an honestly faulty memory. For example, in March 1970, petitioner stated to respondent's agents that all her income was reported; on December 4, 1972, petitioner stated that she had not withheld cash from any deposits and that she never cashed any of her jobbers' checks nor deposited any of them to her personal accounts; on December 15, 1972, petitioner stated that she might have cashed some of the jobbers' checks when she needed money and that her bookkeeper might have withheld cash from deposits; on February 7, 1973, petitioner stated that she did not see anything wrong with withholding cash from deposits since Mr. Hanks knew what she was doing. At trial, petitioner took the position that she thought her income was reported based on copies of invoices and that, *503 at the time she withheld money from deposits, she was unaware that her actions would result in an understatement of her income. Based on petitioner's prior inconsistent statements and the testimony of other witnesses, we are unable to accept the explanation she offered at trial. In 1968, petitioner withheld cash of almost $ 7,000 from deposits and she deposited jobbers' checks totaling more than $ 9,000 into her personal accounts. Mr. Hanks discussed with petitioner the manner in which Sherry-Lynn's gross receipts would be reconstructed for 1968. Petitioner was aware that Mr. Hanks utilized the deposits to Sherry-Lynn's accounts as gross receipts. Yet, Mr. Hanks stated, and we have so found as a fact, that petitioner never informed Mr. Hanks that all of Sherry-Lynn's receipts were not deposited. Additionally, even were we to believe petitioner's testimony that she thought Sherry-Lynn's income was based on copies of her invoices, Sherry-Lynn's income for 1968 would still be understated in the amount of the 5 cents per garment freight allowance. No invoices were prepared for the freight charge, petitioner deposited the freight income to one of her personal bank accounts, and it *504 was not until early 1970 (well after her 1968 return had been filed) that petitioner informed Mr. Hanks that the jobbers were paying her the freight allowance. For 1969, Mr. Hanks reconstructed Sherry-Lynn's gross receipts from copies of invoices and added an amount for freight equal to 5 cents per garment. By looking at the invoice numbers, Mr. Hanks determined that some were missing and questioned petitioner. Petitioner told Mr. Hanks that he had all the invoices which were billed. In fact the schedule of Sherry-Lynn's invoices failed to include 16 invoices to University Sportswear and Boutique Fashions on which Sherry-Lynn was paid approximately $ 15,000. Petitioner does not deny that Sherry-Lynn received this money for work performed but rather hints that Diane Lane, a former bookkeeper, removed the invoices from Sherry-Lynn's offices. Even were we to accept petitioner's explanation, lost or misplaced records do not obviate petitioner's obligation to pay tax on her income. Petitioner's testimony at trial with respect to the 1969 underpayment appears to be that the unrecorded invoices represented work done by Roma-Lee and that petitioner neither recognized the income for *505 this work nor took a deduction when she paid the money over to Roma-Lee. We note that this position appears to be a concession on petitioner's part that she deliberately did not disclose the invoices to either Mr. Herzog or Mr. Hanks. We do not accept petitioner's testimony concerning the missing invoices; it is contradicted by the testimony of Mr. Hanks and is inconsistent with prior statements made by petitioner to respondent's agents. Petitioner's tax returns show that, despite her assertion to the contrary, petitioner did deduct, as "purchased services," payments of $ 6,765 and $ 4,892 in 1968 and 1969 to Roma-Lee or Mr. Resendez. Mr. Hanks stated that he discussed these payments and their treatment with petitioner. Although specifically questioned on December 4, 1972, by respondent's agents concerning transactions with Mr. Resendez and Roma-Lee, petitioner stated only that she loaned Mr. Resendez approximately $ 10,000 in cash. On December 15, 1972, petitioner stated that, to help Roma-Lee get started, Sherry-Lynn did some work for University Sportswear and gave the money to Roma-Lee. Petitioner stated that she reported all the income received from University Sportswear. *506 A taxpayer who withholds necessary information from her accountant cannot shift the responsibility for her admitted underpayments to her accountant. See Bender v. Commissioner,256 F.2d 771, 774 (7th Cir. 1958), affg. a Memorandum Opinion of this Court. In 1968, aware that Sherry-Lynn's gross receipts were reconstructed on the basis of bank statements, petitioner failed to inform Mr. Hanks that not all receipts were deposited into Sherry-Lynn's account. Similarly, in 1969, petitioner failed to inform Mr. Hanks or Mr. Herzog that 16 invoices were omitted from the schedule of invoices. In addition to the consistent pattern of substantial understatements of gross income, the record reveals other facts which sustain our view that petitioner's underpayments of tax in 1968 and 1969 were due to fraud. Petitioner's failure to keep adequate books and records as required by law, see section 6001 and section 1.6001-1, Income Tax Regs., is under the circumstances, material evidence of fraud. Grosshandler v. Commissioner,75 T.C. 1, 20 (1980). Petitioner neither kept nor instructed her bookkeeper to maintain either a cash receipt journal or a general ledger. *507 That petitioner may have been too busy with other aspects of Sherry-Lynn's business is an insufficient excuse. To hold otherwise would "be tantamount to holding that skillful concealment is an invincible barrier to proof." Otsuki v. Commissioner,53 T.C. at 109, quoting United States v. Johnson,319 U.S. 503, 518 (1943). Petitioner's fraudulent intent may also be inferred from the numerous false and misleading statements she made to respondent's agents during the course of their investigation. Grosshandler v. Commissioner,supra. Some of these statements we have already discussed, see pp. 11-12, 14-15 supra.Additionally, on December 4, 1972, petitioner told respondent's agents that she had no savings account from 1967 through 1969; on December 15, 1972, petitioner told respondent's agents that Milson was the only jobber she worked for during 1969. These and other statements made by petitioner are patently false. We recognize that, with respect to the collection of taxes owed by Roma-Lee, petitioner cooperated with respondent. This one instance of cooperation, however, is not sufficient to overcome the weighty evidence *508 against petitioner. In sum, based on the evidence discussed above and our evaluation of the entire record, we conclude that petitioner's underpayments in 1968 and 1969 were due to fraud. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all references to rules are to the Tax Court Rules of Practice and Procedure.↩
2. At trial, petitioner sought to admit into evidence under Federal Rules of Evidence 804(b)(5)↩ an affidavit of Donald D. Roff dealing with Mr. Herzog's employment by Sherry-Lynn. We have concluded that the affidavit is inadmissible hearsay and have not considered its content in making our findings of fact.
3. At trial, petitioner sought to introduce into evidence for corroborative purposes a written statement of Mr. Runkle of the Internal Revenue Service. We conclude that Mr. Runkle's statement is admissible as an admission by a party-opponent. Fed. R. Evid. 801(d)(2)(D)↩.
4. Although 1967 is not directly in issue here, petitioner's return for 1967 showed a net operating loss which was carried forward to 1968. Respondent's determination of unreported income in 1967 wipes out the net operating loss for that year and increases petitioner's tax liability for 1968.↩