JOHN GALLO, Petitioner v. COMMISSIONER OF THE INTERNAL REVENUE, Respondent
Gallo v. Commissioner
Docket No. 8426-78.
United States Tax Court
T.C. Memo 1983-367; 1983 Tax Ct. Memo LEXIS 423; 46 T.C.M. (CCH) 548; T.C.M. (RIA) 83367; June 21, 1983. *423 Held: Deficiencies and I.R.C. 1954 sec. 6653(b) addition to tax not sustained. John Gallo, Pro se. Crombie J. D. Garrett and Howard Philip Newman, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined the following deficiencies and additions to tax: Additions to Tax
Calendar Year
Deficiency
[1] Section 6653(b) 1969
$12,759.74
$6,379.87
1970
14,292.52
7,146.26
Respondent's deficiencies were determined by use of the net worth method. The issues for decision are the amounts of deficiency in tax, if any, in each of the two years and whether or not the section 6653(b) additions to tax have been established. *424 Some of the facts have been stipulated. At the time of filing of the petition, petitioner resided in Lindenwold, New Jersey. Petitioner was a calendar year taxpayer and filed his returns on the cash basis. During each of the two years involved, petitioner was a widower with a dependent child in 1969 and qualified for head of household status in 1970. During the years 1969 and 1970 and apparently for many years before that, petitioner's sole business and occupation was that of gambling on horse races--a pari-mutual bettor. He kept detailed records in a ledger showing his winnings and losses and it is from these records that his tax returns for these two years were prepared. Respondent apparently concedes that the results of petitioner's gambling, as shown in the ledger, were correctly reflected on petitioner's tax returns. The issue is whether petitioner's net worth increased in each of the two years, as reflected in the statutory notice, and if so whether the increases resulted from unreported income from petitioner's gambling. At the time of trial, petitioner was 64 years old. He had received a disability discharge from military service based on a mental or emotional *425 problem during or after World War II. The disability has entitled him to monthly disability benefits in a small amount ever since. This handicap at least contributed to his abandonment of a singing career many years ago and it is apparent that it has continued to the time of trial. We have considerable doubt that petitioner fully understood the significance of many of the items in the stipulation of facts which he signed or of a number of the documents attached thereto, especially in the context of this case. We are also confident that petitioner did not understand respondent's net worth calculation, its significance or how to present explanations or defenses thereto. We were impressed, nevertheless, with petitioner's efforts to cooperate with the Court and to comply with our directions and rulings during the trial. Petitioner answered our inquiries and, frequently with our urging, respondent's questions to the best of his ability. We found petitioner on the whole to be a credible witness, candid and forthright. On the whole, we accept petitioner's testimony as reflecting his best recollection of facts which had occurred 10 to 15 years before the trial. While respondent complains *426 that petitioner told conflicting and incomplete stories during the course of audit interviews, we are convinced that petitioner's conduct was not in this instance an indication of fraudulent intent. Petitioner's reported adjusted gross income for the years 1965 through 1970 varied from a low in 1967 (the year of the death of petitioner's first wife) of $7,640 to a high in 1970 of $17,701. During 1969, the adjusted gross income was $13,650. There appears to be little question that petitioner could not have lived in the style in which he lived, supporting a wife through 1967 and two children through most of this period, on his after-tax income, even supplemented by the small disability pension. We find that petitioner's deceased wife was the principal source of these funds, as we will discuss in more detail below. The deficiencies in the two years, and of course the fraud addition on which respondent bears the burden of proof, [2] are based on respondent's net worth computations. While the net worth method is an acceptable mechanism for testing the accuracy of a taxpayer's tax returns, its use requires the exercise of "great care and restraint." Holland v. United States,348 U.S. 121, 129 (1954). *427 Justice Clark's admonition as to the use of this method of proof is particularly apt in this case. While we cannot say that these pitfalls inherent in the net worth method foreclose its use, they do require the exercise of great care and restraint. The complexity of the problem is such that it cannot be met merely by the application of general rules. [Citation omitted.] Trial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute. * * * [emphasis supplied.] [348 U.S. at 129.] For a taxpayer like petitioner, this chore becomes more than just "hard." As the Supreme Court recognized in Holland, an essential condition of the use of this method is the establishement "with reasonable certainty" of an opening net worth to serve as a starting point. The net worth method is not a system of accounting; rather it is "merely evidence of income" when correctly applied. Lipsitz v. Commissioner,21 T.C. 917, 931 (1954), affd. 220 F.2d 871 (4th Cir. 1955). *428 Respondent assumes a total net worth as of December 31, 1968, of approximately $57,000, most of which was in liquid form. Respondent did not, however, credit petitioner with any cash on hand on that date or at the end of the two subsequent years. We believe this was clearly erroneous. Petitioner required and kept a substantial amount of cash on his person, in his home or in safety deposit boxes to fund his betting. Petitioner's ledger reflects numerous instances of winnings and losses on a single day during 1968, 1969 and 1970 of amounts in excess of $5,000 and on occasion substantially in excess of that sum. Available cash of at least $5,000 would have been essential to fund the gambling activity reflected in the ledger, and we so find. [3] And as the Court of Appeals noted in Phillips' Estate v. Commissioner, "* * * if the Taxpayer * * * had added income, it necessarily required more and larger cash balance." 246 F.2d 209, 212 (5th Cir. 1957).
*429 Thus, if as respondent asserts, petitioner's net worth increased by more than $30,000 in each of the years 1969 and 1970, his available working capital must have been substantially in excess of $5,000. The allowance of no cash on hand is more than unrealistic. And, as we will discuss below, we credit petitioner with additional cash prior to December 31, 1968. [4]
An initial net worth of only $57,000 is wholly unrealistic when we look at the entire record. As the Fifth Circuit held in Phillips' Estate v. Commissioner,supra, "[i]f the opening statement is not *430 substantially reliable, the whole intricate house of cards falls." 246 F.2d at 213. See also Thomas v. Commissioner,232 F.2d 520 (1st Cir. 1956); Fuller v. Commissioner,313 F.2d 73 (6th Cir. 1963). Petitioner in part explained his access to cash as derived from his deceased wife. She generated substantial amounts of cash from her own successful pari-mutuel gambling activities, which gains were probably unreported for Federal income tax purposes. At least they were not included in the joint returns filed for some of the earlier years. Failure to report the gambling winnings of the deceased wife would be consistent with her strenuous efforts to keep the facts of her winnings from petitioner's knowledge, and we find that he had no real indication of the extent and success of her betting at least until after her death. Petitioner's wife had other money-making activities prior to their marriage and it is unclear whether those activities continued to generate cash after the marriage. During her life-time, she maintained one or more safety deposit boxes as repositories for cash and on at least one occasion she gave petitioner some $14,000 *431 in cash which she removed from such a box. We are entitled to make the logical deduction, and we so find, that her expensive living and the comfortable life-style of the couple was supported by her generation of cash. We find that at the time of her death in 1967 petitioner's deceased wife had substantial sums of cash hidden in various places in their residence.While again we cannot make a definitive determination as to the amount, we hold petitioner must be credited in 1968 with continued possession of not less than $10,000 in cash [5] and probably twice that from this source, in addition to his own working capital cash. Respondent's agents were informed of most of these facts during the audit and simply chose to disbelieve petitioner's statements without justification. The First Circuit Court of Appeals has commented: If respondent is to be permitted to make an arbitrary guess as to the proper figure for the cash on hand account, there would seem to be no reason as a general proposition why similar guesses should not be made as to each of the constituent elements comprising the taxpayers' net worth. Under these circumstances the entire net worth technique becomes nothing but *432 an elaborate accounting sham lending a semblance of system and logic to a determination of deficiency which could have no greater validity than the original quesswork upon which it was based. [Thomas v. Commissioner,supra at 526.] One of the more significant increases in net worth during the year 1969, as determined by respondent, is the purchase in November of that year of a residence in which petitioner invested approximately $30,000 of his own funds, completing the purchase with a $20,000 real estate mortgage. The decrease in petitioner's liquid assets during the year as shown by the net worth statement was approximately $16,000. In addition, respondent charges petitioner with over $5,000 in securities acquired during the year and an increase in "household improvements" of slightly more than $12,000. Thus, if respondent's opening net worth were correct, petitioner's net worth improved by over $30,000 during 1969. Petitioner has consistently asserted that to assist in the purchase of the house, *433 his mother gave him about $15,000, the major portion of which had represented her accumulation over the years of petitioner's disability checks. The facts again are not altogether clear, but having observed petitioner's demeanor on the witness stand and giving consideration to all of the testimony, we find as a fact that petitioner did receive at least $15,000 from his mother at about the time of the 1969 home purchase. [6]
Respondent argues that petitioner's claimed sources *434 of cash are inconsistent with records of petitioner's borrowings from loan companies, both before and after his wife's death, but such borrowings are equally inconsistent with respondent's theory of having large enough unreported betting winnings to have generated during 1969 and 1970 the increases in net worth determined by respondent. While it is possible that petitioner might have been unusually lucky at his gambling activities in these two years, as contrasted with prior years, the record does not support the conclusion that petitioner had net winnings in excess of $30,000 in each of the years 1969 and 1970. His reputation as a gambler throughout this period was entirely consistent with the winnings reported on his tax returns and not more than that. Petitioner's standard of living both before and after 1969 may be explained only by substantial unreported income or the existence of cash infusions from other sources. Petitioner has satisfied us that the apparent increases in his 1969 and 1970 net worth were not derived from unreported income generated by him during those years but came from cash accumulated by his mother and his wife and given or left to him. In addition *435 to the failure of respondent's net worth computation to take into account cash on hand on December 31, 1968, and the cash gift from petitioner's mother in 1969, the net worth calculation contains other deficiencies. For example, there is included in the stipulation an extract from the net worth computation which purports to reflect the value of household improvements, including furniture and furnishings, as of the end of each of the years 1968, 1969 and 1970. This schedule was apparently prepared at least in part from estimates and statements made by petitioner to respondent's agents during the course of their audit. One of the exhibits attached to the stipulation, the statement of settlement of the 1969 home purchase, shows affirmatively that petitioner was charged as part of the purchase price with $3,904 of "optional extras." It is more than probable that certain of these extras which were included in the $51,337.74 purchase price were duplicated in the net worth statement's separate itemization of the household improvements. This possibility is so apparent that at the least the record should have contained some evidence that duplication was unlikely. While petitioner signed *436 the stipulation, he did not fully comprehend its import (as we have found), and therefore did not understand the necessity of verifying its accuracy. [7]
A further adjustment to the net worth determination must be taken into account. Respondent failed to credit petitioner with receipt of loans from one William Gerace aggregating $10,000. We find that petitioner borrowed $5,000 in 1968 and $5, 000 In 1969 from this individual with the entire loan outstanding at the end of 1970. Whether this loan should be regarded as a further addition to cash on hand or as included in one or more of the asset increases in 1968 and 1969 would be sheer speculation. Clearly, liabilities should have been increased in 1968, 1969 and 1970 to reflect this loan. [8]
*437 As a result of all of the foregoing, we find that the net worth determination as a whole is too unreliable to be acceptable. In the words of the Sixth Circuit: What we really have here is not a question of going forward with the proof but the question of determining whether under the particular circumstances of this case the evidence, or the lack of evidence, considered as a whole in the light of the warnings given to us in Holland v. United States,supra, was of such a character as to rebut the presumption that the Commissioner's deficiency determination was correct. * * * [Polizzi v. Commissioner,265 F.2d 498, 502 (6th Cir. 1959).] The burden is upon petitioner to show that the deficiencies as determined by respondent by the net worth method are erroneous, Rule 142(a), Tax Court Rules of Practice and Procedure. We find that petitioner has discharged this burden fully as to both years. In this case, respondent's determination contains not merely a "strong underlying element of guesswork * * *," Polizzi v. Commissioner,supra at 502, but the most critical element--the opening net worth--is so erroneous that we *438 have nothing to use for comparison with the closing net worth. Petitioner is required only to show that the Commissioner's determination is invalid, not the correct amount of his tax liability. Polizzi v. Commissioner,supra.As we found in Jacobs v. Commissioner,T.C. Memo. 1974-73, "The evidence presented by respondent does not show the correct amount of petitioner's reconstructed taxable income or provide any basis for estimating it." Finally, we again note that petitioner's income from his pari-mutual betting was carefully recorded in petitioner's ledger and correctly transferred to petitioner's tax returns for these two years. While the gambling activity could be at least hypothetically a source for unreported winnings, on the basis of this record, we do not find it to be so as to petitioner. We find no deficiencies in tax for either year. The final issue is whether or not an addition to tax under section 6653(b) has been substantiated. [9] Respondent has the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. See Miller v. Commissioner,51 T.C. 915 (1969). *439 The existence of fraud is a fact which we must determine on the basis of all of the facts and circumstances before us. Estate of Pittard v. Commissioner,69 T.C. 391 (1977). And fraud means "actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941). Fraud is not to be imputed or presumed, Otsuki v. Commissioner,53 T.C. 96 (1969), and the mere failure to report income is not enough to establish fraud. Otsuki v. Commissioner,supra.Circumstances which at most create only suspicion are not enough. Green v. Commissioner,66 T.C. 538, 550 (1976). In this case, not only has fraud not been proven by clear and convincing evidence; we are convinced in fact that if there were any understatement of income by petitioner it was the result of inadvertence, and not with the intent to defraud the United States. We find for petitioner. *440 Decision will be entered for petitioner.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Section 7454(a).↩
3. Omission of this cash working capital from net worth in each of the three years would not change the 1969 and 1970 net worth increases as determined by respondent. It is merely one of many inaccuracies in the net worth computation, and this alone casts serious doubt on the calculation since it demonstrates that the starting point has not been established "with reasonable certainty."↩
4. Petitioner's statements to respondent's agents as to cash on hand were, in common with the rest of his answers to their interrogation, vague and conflicting, but we find it inconceivable that the level of his betting activity, as reflected in his ledger during his almost daily attendance at race tracks, could have been carried on without possession of substantial cash. We have in this finding placed the greatest weight on petitioner's testimony, particularly in response to our own questions. Also, his deceased wife's successful betting activities was corroborated by two unrelated witnesses.↩
5. Cash from this source probably was closer to $20,000, but a definitive finding on this record of more than $10,000 would be somewhat speculative.↩
6. In this connection, we have taken into account the fact that one of respondent's special agents during the course of his investigation interviewed petitioner's mother, now deceased, and she apparently disclaimed the making of any such gift to petitioner. The elder Mrs. Gallo was at the time of the interview frail, in poor health and tending toward senility.The testimony by respondent's agent was obviously hearsay, likely to be biased and not tested on cross-examination since petitioner was not qualified to accomplish that. Moreover, petitioner's suspicious attitude towards respondent's agents may well have been shared by his mother. For these reasons, we give little credence to the agent's testimony.↩
7. Where the record shows that the facts are at variance with the stipulation, we have discretion to decline to follow the stipulation. Jasionowski v. Commissioner,66 T.C. 312↩, (1976). This is a particularly appropriate case in which to exercise that discretion and we have done so.
8. Respondent was also aware in advance of the trial of petitioner's contention as to this loan and was in fact in touch with Mr. Gerace. Why he was not called as a witness is not explained.↩
9. Without tax deficiencies, there is nothing to which the fraud penalty can attach but under the circumstances of this case petitioner is entitled to our determination of the fraud issue.↩